SS Richmond LLC,

– and –

MK Richmond LLC,

Plaintiffs,

– against –

Christopher A. Harrison,

The C.A. Harrison Companies, LLC,

CAH Model Tobacco, LLC,

– and –

McKenzie Blake Development Company, LLC,

Defendants.

Case No.  3:22cv405

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................ 1

THE PARTIES .............................................................................................................. 3

I.      PLAINTIFFS ...................................................................................................... 3

II.     DEFENDANTS .................................................................................................. 3

III.    RELEVANT NON-PARTIES............................................................................ 3

JURISDICTION AND VENUE.................................................................................... 4

FACTUAL BACKGROUND ....................................................................................... 4

IV.    DEFENDANTS' BUSINESS ACTIVITIES .................................................... 4

V.      PRIOR BUSINESS AND LEGAL DEALINGS OF THE PARTIES RELEVANT TO THIS DISPUTE ............................................................................ 4

VI.    THE MODEL TOBACCO PROJECT............................................................... 6

       A.        Harrison Fraudulently Obtains Capital from Non-party Steven Sushner .............. 6

       B.        Harrison Fraudulently Convinces SSR and MKR To Invest in the Model Tobacco Project and They Form Development Group ........................................ 9

       C.        Harrison Delays the Project.................................................................... 15

       D.        Harrison "Creates" a Fraudulent Company to Conceal His Fraud Against SSR and MKR...................................................................................... 18

       E.        Harrison, SS Richmond, and MK Richmond Create Model Tobacco Developer, LLC.......................................................................................... 21

       F.        Harrison Surreptitiously and Fraudulently "Amends" the DG Operating Agreement. ........................................................................................... 22

       G.        Harrison Engages in a Pattern of Fraudulent Financial Transactions and Accounting Practices............................................................................ 26

               1.        Fraudulent Financial Transactions ....................................................... 26

                     (a)        Improper Commingling .......................................................... 27

                     (b)        Transactions for Personal Purposes .......................................... 27

                     (c)        Unauthorized Withdrawals from TD Bank Account.................. 28

                     (d)        Unauthorized Payments ........................................................... 33

               2.        Fraudulent Accounting.......................................................................... 34

                     (a)        Fraudulent Expense Records Mislead SSR and MKR about the Project and Cause them to Contribute Additional Capital ................................................................................ 34

                     (b)        Denial of Benefits of Rent...................................................... 37

       (c)      Fraudulent Capital Account Reconciliations Steal $431,300 ....... 38

H.    Harrison Purports To Dilute SS Richmond's and MK Richmond's Interest In Developer ............................................................................................. 40

FIRST CLAIM FOR RELIEF
Violation of Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962(b), 1964(c) .......................................... 43

SECOND CLAIM FOR RELIEF
Securities Fraud (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5) ............................................................................................ 47

THIRD CLAIM FOR RELIEF
Breach of Contract ................................................................... 50

FOURTH CLAIM FOR RELIEF
Breach of Contract ................................................................... 51

FIFTH CLAIM FOR RELIEF
Fraud ....................................................................................... 52

SIXTH CLAIM FOR RELIEF
Dissociation of Defendants from Development Group (Va. Code § 13.1-1040.1(5)) ............................................................. 52

SEVENTH CLAIM FOR RELIEF
Dissociation of Defendants from Developer ............................ 53

Plaintiffs SS Richmond LLC ("SSR") and MK Richmond LLC ("MKR") ("Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Defendants Christopher A. Harrison ("Harrison"), The C.A. Harrison Companies, LLC ("CAHC"), CAH Model Tobacco, LLC ("CAH") and McKenzie Blake Development Company, LLC ("McKenzie Blake"), and allege as follows:

## NATURE OF THE CASE

1.      For nearly five years, Defendant Harrison, the owner, sole member and manager of Defendants CAHC, CAH and McKenzie Blake, has been using a pattern of bank fraud, wire fraud, mail fraud and money laundering in an effort to seize control of and increase his interest in a project to purchase and refurbish a closed tobacco manufacturing facility in Richmond, Virginia known as Model Tobacco (the "Model Tobacco Project").  Through a relentless campaign of false statements, false financial records, fraudulent financial transactions, fraudulent expenses, and forged documents, Harrison's campaign is near its ultimate objective: to steal the interests in the Project belonging to SSR and MKR, his supposed partners.  Instead of treating SSR and MKR as true partners consistent with his legal obligations, Harrison has been working behind the scenes to dupe them as part of a plan to wrest their investment away from them.

2.      This story centers around Harrison's ongoing scheme to defraud investors to finance his plan to purchase an abandoned tobacco factory in Richmond and convert it into a residential and commercial real estate development.  Harrison's sprawling scheme is larger than his partnership with SSR and MKR; it involves numerous investors and stretches back to before SSR and MKR first invested in the Model Tobacco Project.  As early as 2017, Harrison had induced an investor to fund the Project in exchange for equity in an LLC that did not exist.  After defrauding this first investor for $50,000, Harrison set his sights higher, using false statements about the Project and exaggerated descriptions of his own experience to entice SSR and MKR into

agreeing to invest over $1 million into the Project. For their purpose, Harrison, SSR, and MKR formed Model Tobacco Development Group LLC ("Development Group"), which Harrison, through his entity CAHC, would manage. In the following years, Harrison systematically defrauded SSR and MKR: he used company funds for personal purposes; he cooked the books to falsely inflate his own purported capital contributions; he brazenly ignored the operating agreement's financial controls; he mixed Development Group's money with money from across a web of limited liability companies he controls; and he defrauded additional investors to cover the obligations that he personally owed SSR and MKR under the terms of their agreement. The end result was that Harrison's two "partners" and investors, SSR and MKR, were badly misled and had virtually no true knowledge of what was occurring with the company or the Project.

3.     While this fraud proceeded, the project moved forward. Development Group bought the land and abandoned factory. Months later, they were on the verge of securing the construction financing for the Project when Harrison saw his chance to put a capstone on his fraud. Among the hundreds of pages of documents and dozens of signatures required for the closing of the financing, he slipped a single additional signature page, detached from any full document. According to its heading, it was a new signature page for the Development Group's operating agreement. Not thinking twice about re-signing a document they had already signed years earlier, SSR and MKR signed it amid the pile of other closing papers. But Harrison did not attach that signature page to the real operating agreement. He attached it to a new, fraudulent operating agreement that provided Harrison a means of stealing SSR and MKR's shares of the Project.

4.     In February of this year, Harrison sprung his trap and took the steps to usurp for himself SSR's and MKR's interests in the Project and cement his control over the Project and its

profits. SSR and MKR turn to this court for justice and relief from Harrison's campaign of fraud and abuse.

## THE PARTIES

### I.     PLAINTIFFS

5.     Plaintiff SS Richmond LLC is a Virginia limited liability company.

6.     Plaintiff MK Richmond LLC is a Virginia limited liability company.

### II.    DEFENDANTS

7.     Defendant Christopher A. Harrison is a citizen and resident of the District of Columbia.

8.     Defendant The C.A. Harrison Companies, LLC is a District of Columbia limited liability company with its principal place of business in Bethesda, Maryland. On information and belief, Harrison is the sole member and manager of The C.A. Harrison Companies, LLC.

9.     Defendant CAH Model Tobacco LLC is a Virginia limited liability company. On information and belief, Harrison is the sole member and manager of CAH Model Tobacco LLC.

10.    Defendant McKenzie Blake Development Company, LLC is a Virginia limited liability company. On information and belief, Harrison is the sole member and manager of McKenzie Blake Development Company.

### III.   RELEVANT NON-PARTIES

11.    Model Tobacco Development Group LLC is a Virginia limited liability company.

12.    Model Tobacco Developer, LLC is a Virginia limited liability company.

13.    Model Tobacco Lofts Development LLC was, on information and belief, never an existing legal entity. It was a fictitious creation of Defendants used in perpetrating the fraudulent scheme described in this Complaint.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit pleads claims arising under the law of the United States.

15.     This Court has personal jurisdiction over the Defendants because each Defendant transacts business in the Commonwealth of Virginia, including but not limited to the Model Tobacco Project that is the subject of this action.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## FACTUAL BACKGROUND

## IV.     DEFENDANTS' BUSINESS ACTIVITIES

17.     Defendant Harrison is the founder and CEO of Defendant CAHC.  He established CAHC as a limited liability company in the District of Columbia.  According to its website, CAHC "is a real estate investment and development company that specializes in renovating historic properties into residential, retail and mixed-use commercial space."[1]

18.     Defendant Harrison purports to have "provided development oversight and overall leadership for more than 100 projects by" CAHC.

## V.     PRIOR BUSINESS AND LEGAL DEALINGS OF THE PARTIES RELEVANT TO THIS DISPUTE

19.     In 2017, Harrison and CAHC were seeking funding for the purchase of 1814 Ingleside Terrace NW, a single-family home in the Mt. Pleasant neighborhood of Washington, D.C. (the "Ingleside Property").

---

[1]     https://caharrisoncompanies.com/about/.

20.     Harrison approached Santorini Capital LLC ("Santorini"), a real estate development and financing company in Washington, D.C., about obtaining a loan to purchase the Ingleside Property.  Mr. Snider and Mr. Kuehn are the sole owners of Santorini.

21.     In September 2017, Harrison formed 1814 Ingleside LLC.  Harrison is the sole member of 1814 Ingleside LLC.

22.     After negotiations, the parties agreed on financing terms and, on October 2, 2017, 1814 Ingleside LLC executed two promissory notes in favor of Santorini: one for $1,075,000 and one for $75,250 (the "Promissory Notes").  Harrison personally guaranteed both Promissory Notes.

23.     The Promissory Notes required that 1814 Ingleside LLC begin making payments, including interest, on November 1, 2017.

24.     Beginning in early 2018, however, 1814 Ingleside LLC and Harrison failed to make required payments, breaching their contract with Santorini and defaulting on the Promissory Notes.

25.     In February 2021, Santorini filed suit against 1814 Ingleside LLC and Harrison.  As relevant to this complaint, based on an agreement with Harrison, Santorini reduced the amount of damages that it sought by $431,300, in exchange for an equal capital contribution credit for SSR and MKR in the Model Tobacco Development Group.  This offset, and Harrison's fraudulent refusal to provide the promised capital contribution credit, is described in greater detail *infra* in Section VI.G.2.c.

26.     On November 18, 2021, the District of Columbia Superior Court granted summary judgment to Santorini and awarded $1,373,717.45, which comprised the entire demanded amount of $1,278,372.73 plus pre-judgment interest.  This judgment remains outstanding.

27.     In Santorini's efforts to enforce its judgment against Harrison, it served writs of attachment on numerous companies of which, on information and belief, Harrison was the sole

member and manager, including CAHC, Harrison & Harrison LLC, Plant 64 DC MC LLC, Whitaker Park Lofts Development LLC, Holbrook Condominiums LLC, Longfellow Arms NWDC LP, and Whitaker Park Hotel Development LLC.

28.     Harrison, on behalf of each of these companies, represented to the court that they neither employed Harrison nor owed any money to him.   Even CAHC (through Harrison) represented that Harrison was not its employee even though its website states that Harrison is its Chief Executive Officer.

## VI.     THE MODEL TOBACCO PROJECT

29.     The Model Tobacco Project is a fifteen-acre collection of seven buildings located on Jefferson Davis Highway in Richmond, Virginia.   The complex's centerpiece is the Model Tobacco Building, a six-story art deco building constructed between 1938 and 1940.   The complex previously served as a factory for the United States Tobacco Company before being shut down decades ago.

30.     In 2017, Defendants Harrison and CAHC became interested in purchasing the Model Tobacco complex and converting it into apartments and commercial space.

### A.     Harrison Fraudulently Obtains Capital from Non-party Steven Sushner

31.     Harrison's fraudulent effort to usurp control of the Model Tobacco Project begins in the middle of 2017, months before either SSR or MKR were even first pulled into his web of lies.

32.     In mid-2017, Harrison approached Mr. Steven Sushner, the owner and President of District Title Corporation, about investing in the Model Tobacco Project.

33.     Specifically, Harrison offered Mr. Sushner a 4% stake in a company called "Model Tobacco Lofts LLC" in exchange for an investment of $100,000.   Harrison represented that he had personally contributed $1,000,000.00 toward this company and owned a 71% stake in it.

34.     "Model Tobacco Lofts LLC" never existed and, on information and belief, was a fictitious creation of Harrison for the purpose of defrauding Mr. Sushner.

35.     In or around the middle of September 2017, Harrison sent Mr. Sushner, via email to Mr. Sushner's District Title email account, a document that purported to be minutes of a meeting of Model Tobacco Lofts LLC held on September 12, 2017. These minutes purported to show the fictitious company approving Mr. Sushner's investment and granting him 4% equity in exchange for $100,000.

36.     On or about September 27, 2017, Mr. Sushner agreed to Mr. Harrison's proposal and sent, via wire transfer, $50,000 as the first installment of his $100,000 investment in the non-existent Model Tobacco Lofts LLC.

37.     Also on or about September 27, 2017, Mr. Harrison sent Mr. Sushner, again by email, a document that purported to be the operating agreement for the company Mr. Sushner was investing in. But Mr. Harrison could not keep his fraudulent companies straight: the fake company was now called "Model Tobacco Lofts Development LLC"—not Model Tobacco Lofts LLC.

38.     Like its forebearer, Model Tobacco Lofts Development LLC never actually existed either in 2017 or, as described *infra* in Section VI.D, in the following years when Harrison resurrected this fictitious LLC to continue his fraudulent scheme.

39.     On or about August 17, 2018, despite having received $50,000 from Mr. Sushner, Harrison contacted him, via email, and claimed that he had never received a response on the investment offer. When Mr. Sushner challenged Harrison's lie, Harrison backpedaled, claiming that he had received the $50,000 but had not received signed paperwork from Mr. Sushner. Harrison further represented to Mr. Sushner that he had secured all necessary debt financing for

the Model Tobacco Project and was in the process of securing all equity funding, which he expected to complete by the end of September 2018.

40.     As described in greater detail below, each of these representations was patently false: by August 2018, Harrison had not secured the debt financing for the Project. Moreover, he had already entered into a separate equity funding arrangement with SSR and MKR through the separate (and real) Development Group.

41.     On or about February 15, 2019, after Mr. Sushner inquired about the status of the "paperwork" Mr. Harrison said had never been completed, Harrison told Mr. Sushner, via email, that he would send cleaned up paperwork (for the fictional companies) to Mr. Sushner. Harrison never did so.

42.     On or about September 18, 2019, Mr. Sushner again asked Harrison, via email, about the status of the Project and inquired why Harrison had not issued any Form K-1's for the companies in which Mr. Sushner was under the impression he owned equity.

43.     On or about September 20, 2019, in response, Harrison told Mr. Sushner, via email, that Mr. Sushner had never actually become an investor because he had only sent $50,000 instead of $100,000 and had never signed the paperwork, which Harrison had never sent and which pertained to fictitious companies that did not actually exist. Harrison said that instead he intended—based on his own unilateral decision—to treat Mr. Sushner's $50,000 as a loan and to return it.

44.     To date, Harrison has not returned the money belonging to Mr. Sushner.

45.     Mr. Sushner has since filed suit against Harrison and his companies in District of Columbia Superior Court. The case remains pending.

**B. Harrison Fraudulently Convinces SSR and MKR To Invest in the Model Tobacco Project and They Form Development Group**

46.     Harrison and CAHC began using a pattern of fraud in an effort to unlawfully acquire, increase and maintain their interests in the Model Tobacco Project.

47.     In late 2017, Harrison approached Mr. Snider and Mr. Kuehn, the owners of SSR and MKR, respectively, about investing in the Model Tobacco Project.

48.     At the time, Harrison and Santorini Capital had recently signed the Promissory Notes for the Ingleside Property and Harrison was repaying those Notes.

49.     In phone calls throughout September 2017, Harrison described the Model Tobacco Project to SSR and MKR in order to cause them to invest money into the Project. Specifically, Harrison told SSR and MKR that the Project was "shovel-ready," that he had debt financing in place for the purchase of the Model Tobacco site and construction of the Project, and that the acquisition of the site would close in early 2018.

50.     On these phone calls, Harrison also touted his own credentials, claiming to have significant experience in developing projects that were similar to the Model Tobacco Project in size and scope, including both residential and commercial developments.

51.     On one occasion, Mr. Harrison invited Mr. Snider and Mr. Kuehn to visit the Plant 64 development project in Winston Salem, North Carolina which, similar to Model Tobacco, had involved the conversion of an industrial facility into residential and commercial space. Mr. Harrison claimed full credit for Plant 64's completion, an accomplishment he claimed despite "bad partners who exerted too much financial control over the project."

52. Contemporaneous with these phone calls, Harrison also sent SSR and MKR, via email,[2] a copy of a purchase agreement he had executed on August 14, 2017, with the then-owner of the Model Tobacco site. The agreement required Harrison to close on the purchase transaction within one year of its execution.

53. On or about September 14, 2017, Harrison sent SSR and MKR, via email, an offering memorandum for the Model Tobacco Project (the "Offering Memorandum"). This Offering Memorandum represented that the Project would be completed by late 2019, which would have necessarily required construction to begin by mid-2018 due to the size of the project. Harrison subsequently resent this Offering Memorandum to SSR via email on October 17, 2018.

54. On September 19, 2017, SSR, relying on the Offering Memorandum and Harrisons' representations about his own ability to manage the project and that construction would begin imminently, sent Harrison, via email, proposed terms pursuant to which SSR and MKR would agree to invest in the Project. On September 21, 2017, Harrison replied accepting these terms and began preparing documents to complete the investment.

55. On October 7, 2017, as the parties continued the negotiations regarding SSR's and MKR's investment, Harrison sent SSR and MKR, via email, a "Bank Package" containing a description of the Project and financial projections. Among many other representations, this document stated that Harrison expected to purchase the Model Tobacco site in the second quarter of 2018, yet also claimed that construction would start on March 1, 2018 (and finish by September 1, 2019)—belying either possession of a time machine or a cavalier attitude toward the truth when inducing investors. It provided cash flow projections with post-development rental income

---

[2] Throughout this complaint, all emails sent by or to Harrison used the email address chris@caharrisoncompanies.com.

beginning in 2019, and stated that Harrison had "developed over 1000 residential units in the Richmond, North Carolina and Washington DC metro markets, and understands how to develop historic adaptive reuse projects."

56. On December 19, 2017, shortly before SSR and MKR finalized their decision to invest, Harrison sent, via email, a revised "Bank Package" that now stated that the purchase of the Model Tobacco site would close in the first quarter of 2018 (within three months of this new projection) and repeated the statements about construction timeline and when rental income would begin from the October 7 version of the Bank Package.

57. As a result of Harrison's representations throughout the fall and winter of 2017, SSR and MKR perceived Harrison as a legitimate businessman and the investment as secure. They understood from Harrison's representations that, if they invested in the Model Tobacco Project, the land would be purchased within a matter of months, construction would begin shortly thereafter using debt financing that had already been secured, construction would be complete by 2019, and they would begin seeing returns on their investment by late 2019.

58. But in truth, each of these representations was false and Harrison knew they were false. He used these false representations to procure an investment from SSR and MKR to fund his Model Tobacco Project. SSR and MKR were unknowingly going into business not with the experienced developer and legitimate businessman Harrison had held himself out as, but with a con artist.

59. After final negotiations, relying on Harrison's representations, SSR and MKR agreed to invest $1.6 million into the Model Tobacco Project, and the parties agreed to form Model Tobacco Development Group LLC ("Development Group") to control their relationship. On December 29, 2017, Mr. Snider as manager of SSR, Mr. Kuehn as manager of MKR, and Harrison

as manager of CAHC executed the Development Group Operating Agreement (the "DG Operating Agreement"). From the start, Harrison failed to live up to his promises and immediately began obfuscating the project's finances, as the DG Operating Agreement omitted certain exhibits including the project budget, expenses and business plan, which SSR and MKR could have used to hold Harrison accountable.

60. SSR and MKR were passive investors in the Project and Development Group, relying on Harrison and his claimed experience and expertise in the property development industry to develop the Project.

61. In addition to being a member of the Development Group, Harrison, through CAHC, was also to be the manager of the company.

62. On May 1, 2020, CAHC transferred its membership interest in Development Group to CAH, but CAHC remained as manager.

63. This Operating Agreement reflected essential aspects of the parties' negotiated agreement without which SSR and MKR would not have joined the Development Group: the mandatory capital contributions of the members would be capped at $1,637,136.00, and neither SSR and MKR would guarantee any of Development Group's financial obligations or excess costs. Harrison agreed that he would provide guarantees to complete the residential portion of the Project.

64. The DG Operating Agreement contained provisions requiring Harrison to provide SSR and MKR with Development Group financial statements including balance sheets, income or loss statements, capital account statements, and cash flow statements; tax documents; and any other reasonable reports or information that SSR or MKR requested.

65. The DG Operating Agreement included financial controls as well. Specifically, the manager (CAHC) required the consent of both SSR and MKR to (a) adopt a new budget or business

plan; (b) amend an existing budget or business plan; (c) engage in any transaction with itself or an affiliate; or (d) enter any agreement or contract incurring an obligation of more than $50,000. In addition, the DG Operating Agreement prohibited Development Group funds from being commingled with the funds of any other entity, and required the signature of two members for any payments from a Development Group bank account.

66. On February 16, 2018, SSR, MKR, and CAHC opened a bank account for Development Group at TD Bank (the "TD Bank Account"). TD Bank's account-opening forms required only a single member to approve withdrawals. On February 23, 2018, however, Harrison emailed SSR and MKR specifically acknowledging the requirement that two members provide signatures for any withdrawals from the Account.

67. Once Development Group's account was opened at TD Bank, SSR and MKR made deposits in the account to make their contractually required capital contributions.

68. Harrison did not make his contractually required deposit. Instead, Harrison claims to have incurred expenses on behalf of Development Group, paid those expenses with his personal credit cards and from bank accounts associated with other companies he controlled including CAHC, McKenzie Blake, and CAH, and then considered those expenses to be his "contributions" to the company. Notably, despite Harrison claiming to have expended substantial funds from these different entities as his "contributions," he has represented in separate litigation that he receives no income from any of the entities.

69. For example, on or about February 22, 2018, Harrison sent an email to SSR and MKR representing that he had spent $210,855.85 on expenses for Development Group, which constituted 28% of his required equity, so he requested that SSR and MKR contribute 28% of their required equity to the TD Bank account.

70. Harrison's assertion was false. Even according to an expense report he himself prepared and provided much later, by February 22, 2018, Development Group had incurred expenses of only $52,010.01 after the execution of the DG Operating Agreement.

71. The expense report reflects additional expenses in the amount of $139,229.42 that Harrison appears to have incurred before the execution of the DG Operating Agreement. Even including those expenses—which cannot be obligations of Development Group, as its operating agreement authorized no such reimbursements—Harrison's claimed expenses of $210,855.85 were substantially more than Harrison's own purported records could substantiate.

72. Unaware of Harrison's duplicity and still optimistic about the Model Tobacco Project and their new partnership with Harrison, on February 28, 2018, SSR and MKR complied with his request and each sent, via wire transfer, $166,895.82—the exact amount requested—to Development Group's TD Bank account, as the first payment of their pledged capital.

73. Harrison repeated the same process more than a dozen times between 2018 and 2021. By automatically crediting himself with capital contributions in the amount of expenses he claimed to have incurred, Harrison systematically evaded and violated the DG Operating Agreement's financial controls. By unilaterally spending money from his own accounts, he deprived SSR and MKR of their contractual rights to review and approve or reject expenses in excess of $50,000, approve or reject reimbursements to Harrison's own entities, and approve or reject withdrawals from the TD Bank Account, which was intended to—but, because of Harrison's duplicity did not—act as a central account for all Development Group contributions and expenses

74. Harrison also falsely claimed to deposit capital contributions into the TD Bank Account. For example, on April 23, 2019, Harrison told SSR and MKR, via email, that he would make his capital contribution on the following day. On April 24, 2019, Harrison confirmed, via

email to SSR and MKR, that he made the deposits. But in reality, Harrison made no capital contribution to the TD Bank Account on or anywhere around April 24, 2019.

75. Similarly, on February 6, 2020, SSR emailed Harrison and asked if he had funded his portion of a $125,000 capital call to the TD Bank Account. Harrison, on the same date, replied to SSR and MKR, via email, stating that he did fund the TD Bank Account but claimed that "it takes three days to leave my brokerage account." Harrison made no deposit into the TD Bank Account on February 6, and no deposit was credited three days after February 6. In truth, Harrison never made the claimed deposit; his email was a bald-faced lie in furtherance of his scheme to defraud SSR and MKR.

76. Harrison also routinely withdrew funds from the TD Bank Account in the form of cashier's checks, the payees of which SSR and MKR could not—and cannot to this date—verify.

**C.    Harrison Delays the Project**

77. As described above, when Harrison had initially persuaded SSR and MKR to invest in the Model Tobacco Project and form the Development Group, he falsely represented to them that the Project was "shovel ready," that the purchase of the Model Tobacco complex would close imminently, that financing for the renovation of the complex was nearly finalized, and that construction would begin by the spring of 2018.

78. Each of these representations was false. The Project was not "shovel ready"; Development Group was not in a position to close on the purchase of the complex; and negotiations for the construction financing were not significantly far along.

79. Harrison covered his lies with even more misrepresentations that gave SSR and MKR good reason to believe the project was nearing completion, including by promising to provide financial and business records requested by SSR and MKR.

80. For example, even a year after his original promised start-of-construction date, Harrison, in a letter on behalf of CAHC sent via email to SSR and MKR on March 25, 2019, represented that Development Group was poised to acquire the Model Tobacco complex by June 15, 2019 and that construction would begin by the end of that month.

81. These statements were false; Harrison knew at the time he signed and sent this letter that Development Group was not in a position to close on the purchase of the land by June 15, 2019 and had not secured or negotiated financing to begin construction of the Project. Specifically, Harrison knew that the lenders with whom Development Group was negotiating to finance the purchase and construction of the Project were unwilling to accept Harrison's guaranty of that financing and that without such a guaranty, the transaction could not be closed.

82. On April 8, 2019, Harrison sent another letter dated April 5, 2019, via email, to SSR and MKR demanding that they also provide guarantees for the financing, in blatant violation of the parties' obligations under the DG Operating Agreement. That letter also promised to provide SSR and MKR with "all of [Development Group's] financial and business records" as SSR had previously requested.

83. Harrison sent SSR and MKR additional correspondence, via email on April 10, 2019, attempting to shift his obligation to provide required guarantees onto SSR and MKR.

84. Ultimately, due to Harrison's fraudulent representations about the status of the project and refusal to comply with his obligations under the DG Operating Agreement, the company did not close on the purchase of the Model Tobacco complex until the middle of June 2020, years after the originally promised closing in December 2017 shortly after the formation of Development Group.

85.     Because of this delay, Development Group was forced to pay numerous fees to extend the purchase contract for the Model Tobacco complex land totaling $1.25 million. Specifically, Development Group paid:

a.      $150,000 on March 6, 2018;

b.      $50,000 on August 21, 2018;

c.      $65,900 on December 24, 2018;

d.      $34,100 on January 7, 2019;

e.      $370,000 on April 24, 2019;

f.      $130,000 on April 24, 2019;

g.      $75,000 on July 16, 2019;

h.      $150,000 on September 16, 2019;

i.      $25,000 on September 16, 2019;

j.      $76,000 on February 6, 2020;

k.      $24,000 on February 6, 2020;

l.      $40,000 on March 3, 2020;

m.      $50,000 on March 4, 2020; and

n.      $10,000 on March 5, 2020.

86.     Harrison avoided detection by misrepresenting these expenses to SSR and MKR. Instead of accurately identifying them as fees—that is, unrecoverable costs—he told SSR and MKR, including by letter sent via email on April 8, 2019, that they were "deposits," indicating that they would be credited against the eventual purchase of the land. Similarly, on June 29, 2019, in letters to MKR and SSR sent via email, Harrison stated that Development Group would be required

to pay an additional $250,000 to extend the closing of the land purchase, but that only $50,000 of that would be "applied as a fee to the owner."

87.     In reliance on Harrison's false representations and under the mistaken belief that they were merely increasing the deposit amount and not simply throwing money away due to the delays caused by Harrison's misrepresentations and refusal to comply with his obligations, SSR and MKR remained invested in the Project and continued to make their capital contributions to Development Group.

88.     Moreover, in reliance on Harrison's repeated false representations that the closing was imminent, SSR and MKR voluntarily contributed capital to Development Group in excess of the maximum that they were required to contribute under the Operating Agreement. To date, Harrison's false statements fraudulently induced SSR and MKR to contribute nearly $4 million, approximately $2.2 million more than their maximum mandatory contribution.

**D.     Harrison "Creates" a Fraudulent Company to Conceal His Fraud Against SSR and MKR**

89.     As described above, Harrison's obligations under the DG Operating Agreement included a requirement to provide guarantees necessary to purchase the Model Tobacco complex and finance the construction of the Project.

90.     When Harrison's efforts to shift this obligation onto SSR and MKR failed, he continued his pattern of using fraud to protect and increase his interest in and control of the Model Tobacco Project by defrauding third parties into assuming his guarantor responsibilities.

91.     On information and belief, in the spring of 2019, Harrison approached Kamran and Ana Raika, a married couple, about serving as co-guarantors for the Model Tobacco Project. Recognizing that the Raikas would not incur such an obligation and potential liability without compensation, Harrison fraudulently induced them to agree to provide the guarantee.

92.     On April 19, 2019, CAHC and ACR I LLC ("ACR"), a company controlled by the Raikas and for which Ms. Raika was the manager, executed a document that purported to be an "Amended and Restated Operating Agreement" for Model Tobacco Lofts Development LLC.

93.     This operating agreement claimed that its business purpose was "to acquire, finance, mortgage, develop, construct, hold, own, maintain, lease, manage, operate, and sell or otherwise transfer" the Model Tobacco complex.  According to the operating agreement, CAHC was to be a 90% owner of the company in exchange for a contribution of $961,500 and ACR was to be a 10% owner of the company in exchange for a contribution of $100.

94.     On the same day, CAHC and ACR also executed a document styled as a "First Amendment" to the operating agreement of Model Tobacco Lofts Development LLC which promised to pay ACR a guarantee fee of $250,000.  This document refers to an original operating agreement executed on November 10, 2017, but is not executed by and does not include reference to any members other than CAHC and ACR.

95.     Notably, this entity was the same as the purported company that Harrison fraudulently induced Mr. Sushner to contribute $50,000 to in 2017.

96.     Despite its operating agreement stating that the company is a District of Columbia Limited Liability Company, at no time has a company named "Model Tobacco Lofts Development LLC" been registered with the District of Columbia Corporations Division.  Public records also lack any record of the company existing in any other state.

97.     On information and belief, Harrison never intended to actually create this company and so never complied with the requirements of Section 29-802.01 of the Code of the District of Columbia that a certificate of organization be delivered to the Mayor of the District.  Likewise, on

information and belief, Harrison never contributed any of the required capital to this bogus company and never had the financial resources to contribute $961,500.

98.     In addition, despite the stated business purpose of the Model Tobacco Lofts Development LLC, it was not a party to the purchase of the Model Tobacco complex and has no interest in the Model Tobacco Project.

99.     On information and belief, in reliance on the fraudulent operating agreements for the fake Model Tobacco Lofts Development LLC, the Raikas agreed to serve as co-guarantors with Harrison for the purchase of the Model Tobacco complex and the financing for the construction of the Project.

100.    On May 1, 2020, SSR, MKR, and Harrison (on behalf of both CAHC and CAH) executed a First Amendment to the DG Operating Agreement adding Mr. Raika as a co-manager solely for the purpose of executing and performing on a bridge loan Development Group intended to procure from Allegacy Federal Credit Union to help fund the purchase of the land.

101.    On October 27, 2020, the date on which, as discussed in more detail below, Development Group closed on its construction financing, Mr. Raika and Harrison executed a joint and several guarantee in favor of certain Virginia tax credit lenders who were financing the Project. On that same day, Mr. Raika also signed a repayment and completion guarantee in favor of Cedar Rapids Bank and Trust, one of the Project's lenders.

102.    On November 2, 2020, Harrison, through McKenzie Blake, paid ACR $25,000 as a "guarantee fee." Harrison included this fee as an expense of Development Group. He did not inform SSR or MKR about this expense.

103.    At the time of the closing of the construction financing, neither SSR nor MKR were aware of the purported Model Tobacco Lofts Development LLC and were not aware of the

arrangement by which Harrison had secured Mr. Raika's agreement to serve as guarantor, including his use of $25,000 of Development Group funds to secure Mr. Raika's guarantee.

### E. Harrison, SS Richmond, and MK Richmond Create Model Tobacco Developer, LLC.

104. On September 13, 2019, Harrison—through CAH, which was formed on the same date—SSR, and MKR agreed to create another Virginia limited liability company called Model Tobacco Developer, LLC ("**Developer**") and signed the company's operating agreement ("**Developer Operating Agreement**"). CAH, SSR, and MKR designated McKenzie Blake, another company exclusively controlled by Harrison, to be manager of Developer.

105. CAH, SSR, and MKR created Developer to act as a vehicle to receive and distribute the management and development fees to be paid for developing the Project.

106. Among other provisions, the Developer Operating Agreement barred Harrison from performing transactions and incurring obligations exceeding $50,000 without the authorization of all members; required that he provide financial statements to SSR and MKR; and prohibited him from commingling Developer funds with personal funds and funds of other of his other companies.

107. On October 27, 2020, SSR, MKR and CAH, as members of Developer, and McKenzie Blake as manager, granted consent, in lieu of a special meeting, for Developer to enter into a Development Services Agreement (the "Services Agreement") with Development Group as well as to authorize Developer to execute the construction financing closing documents.

108. On the same day, Harrison, as manager of McKenzie Blake acting as manager of both Developer and Development Group, executed the Services Agreement. The Services Agreement stated that Developer was to "provide certain services" to Development Group, listing fifteen specific services that were all administrative in nature.

109.     At no point did the parties discuss or otherwise contemplate using Developer to infuse additional capital into Development Group, nor was such an arrangement reflected in the Developer Operating Agreement or the Services Agreement.   Developer never executed any agreement with Development Group other than the Services Agreement.  Indicative of its exclusive role as a fee receptable for future development fees, Developer never issued K-1's to any of its investors as it never incurred any income or loss.

**F.     Harrison Surreptitiously and Fraudulently "Amends" the DG Operating Agreement.**

110.     On October 27, 2020, Development Group closed on the financing for the construction of the Project.

111.     In preparation for the closing, which involved nearly a dozen limited liability companies, the Virginia Housing Development Authority, numerous tax credit financing companies, and multiple Federally-insured banks, Harrison and his attorney, David Lionberger at Hirschler Fleischer P.C., a Virginia law firm, prepared packages of documents that all of the parties, including SSR and MKR, were required to sign.

112.     SSR and MKR received, via Fedex, the documents requiring signature.   The package did not include the full documents, however; it only included the pages specifically requiring their signatures.  Because each of the financial institutions involved in the transaction required original signatures from each member, there were five copies of each signature page, resulting in a total of nearly one hundred pages for each of SSR and MKR to sign.

113.     Among these documents, most of which were signature pages for loan financing documents that SSR and MKR had previously reviewed, were signature pages—one for SSR and one for MKR—with the heading "Signature Page to Operating Agreement of Model Tobacco Development Group LLC."  Based on this heading, SSR and MKR had no reason to believe that

the document was anything other than an original copy of the signature page for the DG Operating Agreement that they had executed nearly three years earlier.

114.    This belief was confirmed by the fact that a Consent and Certificate for the Development Group, which had been provided to SSR and MKR and which also required execution that day, referenced an "Amended and Restated Operating Agreement" for Development Group but attached a copy of the DG Operating Agreement that SSR and MKR had signed in December 2017.

115.    SSR and MKR's beliefs were further confirmed by the structure of the Model Tobacco Project corporate entities that Harrison provided them on October 27, 2020.  This diagram, shown in *figure 1*, was prepared by the tax firm CohnReznick, on information and belief based on information that Harrison provided to the firm.  As depicted below, the diagram matches SSR and MKR's understanding of the relationship between Development Group and Developer: a one-way arrow indicated that Development Group was to pay a development fee to Developer but that Developer was not contributing any capital back to Development Group.



*Figure 1: Model Tobacco Project Structure as Presented on October 27, 2020*

116.    Having no reason to doubt that the signature page was for anything other than a new copy of the DG Operating Agreement so that the financial institutions would have original signatures for all documents or that, at most, admitted the Project's tax credit investors as members, SSR and MKR executed the signature pages for the DG Operating Agreement and returned them to Mr. Lionberger.

117.    Only months later, as their relationship with Harrison degraded, did SSR and MKR learn that Harrison had attached the "Signature Page[s] to Operating Agreement of Model Tobacco Development Group LLC" to what he claimed was an effective Amended and Restated Operating Agreement and First Amendment to the Amended and Restated Operating Agreement (collectively, the "Fraudulent Agreements").

118.    Notably, on the First Amendment to the Amended and Restated Operating Agreement, the pages containing Harrison's signatures featured a heading entitled "Signature Page To First Amendment To Amended & Restated Operating Agreement Of Model Tobacco

Development Group, LLC," whereas the pages with SSR's and MKR's signatures featured headings entitled "Signature Page To Operating Agreement Of Model Tobacco Development Group LLC."

119. The Fraudulent Agreements purport to alter the rights and obligations of the parties in several ways.

120. First, the Fraudulent Agreements purport to substitute McKenzie Blake for CAHC as manager of Development Group.

121. Second, the Fraudulent Agreements purport to create a new obligation of SSR and MKR to fund "Excess Development Costs," expressly reversing the DG Operating Agreement's tight controls on capital contributions and requirement that Harrison guarantee completion of the Project and bear any additional costs.

122. Third, the Fraudulent Agreements purport to impose on Developer—an entity created solely to receive and distribute fees—an obligation to fund any "Excess Development Costs" that SSR and MKR did not cover. Notably, however, even Harrisons' fraudulent "Amended and Restated Operating Agreement" does not include any signature—or even signature page—for Developer purporting to show its agreement to this huge new obligation. Indeed, Developer never consented to incur this obligation, SSR and MKR were never aware of, much less consented to, this obligation, and Harrison alone lacked the authority to incur this obligation, which vastly exceeded the $50,000 limit that he could authorize on his own under the Developer Operating Agreement (or even under his Fraudulent Agreements).

123. In combination with the Developer Operating Agreement, these Fraudulent Agreements provided the mechanism for Harrison to bring his fraud to fruition and steal SSR and MKR's interest in Developer and the Project. Specifically, through his newly created "Excess

Development Costs" funding requirement, he had purported to authorize himself to incur such excess costs, impose the obligation to pay for such costs on Developer, issue Developer capital calls to meet such costs, and, if SSR and MKR failed to pay these fraudulent capital calls, dilute their interest in Developer and increase his own.

### G. Harrison Engages in a Pattern of Fraudulent Financial Transactions and Accounting Practices

124.    Unbeknownst to SSR and MKR, the Fraudulent Agreements were only the tip of the iceberg of Harrison's pattern of fraud. Between 2018 and 2022, Harrison, in his own right and on behalf of CAHC, CAH, and McKenzie Blake, engaged in a series of fraudulent transactions that not only violated the DG Operating Agreement but also the laws of the United States. The end result has been millions of dollars of unauthorized expenses and self-dealing and the theft from SSR and MKR of the $431,300 that Harrison promised—but failed—to credit their capital accounts in exchange for offsetting it against his Ingleside debt.

### 1.    Fraudulent Financial Transactions

125.    As described above, the DG Operating Agreement imposed on Harrison, as manager (through CAHC), certain financial controls. Specifically: Development Group funds could not be commingled with funds of any other person or entity, any transactions with affiliates had to be approved by SSR and MKR, transactions could only be conducted for Development Group's business purposes, two signatures were required for any withdrawal from a Development Group bank account, and any obligation over $50,000 had to be approved by SSR and MKR. Harrison's violations of each of these controls were serial.

(a)     *Improper Commingling*

126.     Between August 29, 2017 and December 16, 2021, Harrison conducted at least 425 transactions purportedly on behalf of Development Group using accounts belonging to either himself personally or to CAH, CAHC, McKenzie Blake, or another business entity he controlled.

127.     Specifically, he conducted (1) at least 197 transactions using an account at Navy Federal Credit Union that belonged to McKenzie Blake; (2) at least 113 transactions using an account at Suntrust Bank that belonged to CAHC; (3) at least 86 transactions using one or more credit cards that belonged to him in his personal capacity; (4) at least 22 transactions using an account at Bank OZK; (5) at least 4 transactions using one or more accounts at Wells Fargo; (5) at least 2 transactions using one or more accounts at TowneBank; and (6) at least 1 transaction using an account at Union Bank.

128.     Development Group did not have an account at any of these financial institutions.

129.     Each of these transactions commingled Development Group's funds with those of Harrison's other businesses and violated the DG Operating Agreement.

(b)     *Transactions for Personal Purposes*

130.     Harrison conducted at least four transactions purportedly on behalf of Development Group and which he included in his accounting for Development Group expenses but that were actually for his personal expenses.

131.     On August 17, 2020, Harrison paid $50.00, recorded as a Development Group expense, to the Virginia State Corporation Commission for the annual registration fee of CAH, his personally controlled entity that he formed to serve as a member of Development Group.

132.     On the same date, Harrison paid $50.00, recorded as a Development Group expense, to the Virginia State Corporation Commission for the annual registration fee of McKenzie

Blake, his personally controlled entity that he formed to serve as manager of Developers and Development Group.

133. On October 18, 2021, Harrison paid $75.00, recorded as a Development Group expense, to the Virginia State Corporation Commission for the annual registration fee of CAH, his personally controlled entity that he formed to serve as a member of Development Group.

134. On the same date, Harrison paid $75.00, recorded as a Development Group expense, to the Virginia State Corporation Commission for the annual registration fee of McKenzie Blake, his personally controlled entity that he formed to serve as manager of Developers and Development Group.

(c)      *Unauthorized Withdrawals from TD Bank Account*

135. Between March 6, 2018 and October 8, 2020, Harrison withdrew funds without authorization from the TD Bank Account on at least 34 instances without either MKR or SSR providing a signature authorizing the withdrawal:

    a.   On March 6, 2018, Harrison withdrew $324,000. Harrison provided no accounting for this withdrawal.

    b.   On March 26, 2018, Harrison sent $155,000 to Spotts Fain PC via wire transfer. On the same date, Harrison recorded a payment of $125,000 to Spotts Fain PC for an "escrow deposit" for 210 Brinser Avenue. Harrison provided no explanation for the $30,000 discrepancy.

    c.   On June 22, 2018, Harrison withdrew $58,008 and recorded a payment of $58,000 to Walter Park Architects via cashier's check. The unaccounted for $8.00 was, on information and belief, paid toward fees for cashier's checks that Harrison falsely stated incurred no fees via email to SSR and MKR in January 2022.

d. On June 29, 2018, Harrison withdrew $51,986.19 and recorded three payments made by cashier's checks: $20,000 to the Timmons Group, $9,986.16 to Sadler & Whitehead Architects ("S&W"), and $10,000 to the Virginia Housing Development Authority ("VHDA"), totaling $39,986.16. Harrison provided no accounting for the remaining $12,000.03 and does not claim to have spent that amount on Development Group expenses.

e. On August 1, 2018, Harrison withdrew $62,194.25. Harrison provided no accounting for how this money was spent and recorded no expenses paid from the TD Bank Account on that date.

f. On August 21, 2018, Harrison withdrew $190,458.73 and recorded five payments that were made by cashier's checks: $7,674.10 to S&W, $27,744.63 to Timmons Group, $60,000 to O'Neil Engineering Services, $50,000 to Charles J. Keck, and $45,000 to Walter Park Architects. The unaccounted for $40.00 was, on information and belief, paid toward fees for cashier's checks that Harrison falsely stated incurred no fees via email to SSR and MKR in January 2022.

g. On September 18, 2018, Harrison withdrew $15,008. Harrison's expense record reflects no payment corresponding to this withdrawal.

h. On September 19, 2018, Harrison withdrew $8,008.00 and accounted for a $8,000 payment by cashier check to VHDA. The unaccounted for $8.00 was, on information and belief, paid toward fees for cashier's checks that Harrison falsely stated incurred no fees via email to SSR and MKR in January 2022.

i. On October 12, 2018, Harrison withdrew, via wire transfer to Bridgeinvest LLC, $100,000 and accounted for this payment as a "loan commitment fee."

j. On October 17, 2018, Harrison withdrew $179,123.45 and accounted for three payments that were made by cashier's checks: $80,400.00 to O'Neil Engineering Services, $12,388.67 to S&W, and $86,310.78 to Walter Park Architects. The unaccounted for $24.00 was, on information and belief, paid toward fees for cashier's checks that Harrison falsely stated incurred no fees via email to SSR and MKR in January 2022.

k. On October 23, 2018, Harrison withdrew $5,000. Harrison's expense record reflects no payment corresponding to this withdrawal.

l. On November 21, 2018, Harrison withdrew $2,925.00. Harrison's expense record reflects no payment corresponding to this withdrawal.

m. On December 24, 2018, Harrison withdrew $65,908.00 and accounted for a $65,900.00 payment that was made by cashier's check to Charles J. Keck. The unaccounted for $8.00 was, on information and belief, paid toward fees for cashier's checks that Harrison falsely stated incurred no fees via email to SSR and MKR in January 2022.

n. On April 24, 2019, Harrison withdrew $370,000.00 and accounted for a $370,000 payment that was made by wire transfer to Beale, Davidson, Etherington & Morris PC.

o. On June 10, 2019, Harrison withdrew $20,000.00 from the TD Bank Account. Harrison did not record any expense justifying this withdrawal.

p.  On June 27, 2019, Harrison sent two wire transfers, each for $14,000.00, to CAHC.  Harrison did not record any expense justifying these withdrawals.

q.  On July 8, 2019, Harrison withdrew $111,000.00.  Harrison did not record any expense justifying this withdrawal.

r.  On July 16, 2019, Harrison withdrew $75,000.00.  On the same date, Harrison accounted for a $75,000.00 payment that was made by cashier's check to Charles J. Keck.

s.  On July 16, 2019, Harrison also withdrew $32,000.00.  Harrison did not record any expense justifying this withdrawal.

t.  On September 9, 2019, Harrison sent $150,000 to Beale, Davison, Etherington & Morris PC by wire transfer and recorded a payment of $150,000 to same.

u.  On September 9, 2019, Harrison also withdrew $22,400.00.  Harrison did not record any expense justifying this withdrawal.

v.  On September 16, 2019, Harrison sent $25,000 to Beale, Davison, Etherington & Morris PC by wire transfer and recorded a payment of $25,000 to same.

w.  On September 16, 2019, Harrison also withdrew $5,000.00.  Harrison did not record any expense justifying this withdrawal.

x.  On September 26, 2019, Harrison withdrew $17,588.00.  Harrison did not record any expense justifying this withdrawal.

y.  On October 1, 2019, Harrison withdrew $415,000.00.  In one version of his expense ledger, prepared in June 2020, Harrison recorded a payment of $225,000.00, ostensibly made by cashier's check to VHDA on October 12,

2019.  Notably, as discussed *infra* in Section VI.G.2.a, this payment is missing from Harrison's December 2021 expense ledger.

z.  On October 15, 2019, Harrison withdrew $401,000.00.  Harrison did not record any expense justifying this withdrawal.

aa.  On October 15, 2019, Harrison also withdrew $2,016.00.  Harrison did not record any expense justifying this withdrawal.

bb.  On February 6, 2020, Harrison sent $76,000.00 to Beale, Davison, Etherington & Morris PC by wire transfer and recorded a payment of $76,000.00 to same.

cc.  On March 3, 2020, Harrison sent $40,000.00 to Beale, Davison, Etherington & Morris PC by wire transfer and recorded a payment of $40,000.00 to same.

dd.  On June 12, 2020, Harrison sent $37,115.00 to McKenzie Blake's account at Navy Federal Credit Union via wire transfer.  Harrison did not account for any corresponding expense.

ee.  On June 15, 2020, Harrison sent $908,842.00 to Safe Harbor Title via wire transfer and recorded a payment of $908,842.00 to same.

ff.  On June 18, 2020, Harrison sent $18,465.00 to McKenzie Blake's account at Navy Federal Credit Union via wire transfer.  Harrison did not account for any corresponding expense.

gg.  On July 22, 2020, Harrison withdrew $10,000.  Harrison did not account for any corresponding expense.

hh.  On August 14, 2020, Harrison withdrew $1,108.  Harrison did not account for any corresponding expense.

136.    None of these transactions was authorized under the DG Operating Agreement, which required two signatures for any withdrawal from a Development Group bank account, including the TD Bank Account.  In making each withdrawal, Harrison falsely represented to TD Bank that he had the lawful authority to conduct that transaction, which representation was false.

(d)    *Unauthorized Payments*

137.    In addition to the transactions described above from Development Group's TD Bank Account, many of which exceeded $50,000 and lacked the requisite authorization, Harrison made at least seven additional unauthorized payments on behalf of Development Group from his commingled accounts in excess of $50,000 without either MKR or SSR providing a signature authorizing the withdrawal.

a.    On July 9, 2019, Harrison paid $77,211.28, via cashier check from his SunTrust bank account, to the City of Richmond.

b.    On November 26, 2019, Harrison purported to pay $201,875.00, via wire transfer from McKenzie Blake's account at Navy Federal Credit Union to VHDA.

c.    On November 28, 2019, Harrison purported to pay $553,125.00, via cashier check from McKenzie Blake's account at Navy Federal Credit Union to VHDA.

d.    On December 11, 2019, Harrison paid $73,806.00, via wire transfer from McKenzie Blake's account at Navy Federal Credit Union to the City of Richmond.

e.    On April 13, 2020, Harrison paid $75,000, via wire transfer from McKenzie Blake's account at Navy Federal Credit Union to Walter Park Architects.

f.  On October 8, 2020, Harrison paid $75,000.00, via cashier's check from McKenzie Blake's account at Navy Federal Credit Union to CAHC for "Reimbursement Construction Management – Direct Admin Costs."

g.  On October 9, 2020, Harrison paid $75,000, via cashier check from McKenzie Blake's account at Navy Federal Credit Union to Lewis Brothers Construction.

138.  Each of these transactions constituted a breach of the DG Operating Agreement.

### 2.  Fraudulent Accounting

139.  Harrison furthered his fraudulent scheme through the use of fraudulent accounting records in order to mislead SSR and MKR about the use of their funds, cause them to contribute additional capital beyond the maximum they were required to contribute under the DG Operating Agreement, deprive them of the benefit of rents received from the Project's tenants, and steal $431,300 from them.

### (a)  *Fraudulent Expense Records Mislead SSR and MKR about the Project and Cause them to Contribute Additional Capital*

140.  As described above, Harrison, in his role as manager of Development Group through either CAHC or McKenzie Blake, repeatedly conducted unauthorized transactions, transactions with his own affiliated entities, and commingled Development Group's funds with his personal funds and those of his other businesses.

141.  To conceal his wrongdoing and induce SSR and MKR to continue their investment in the project, Harrison produced numerous documents purporting to show the "Total Expenses" of the Model Tobacco Project. Each document, including but not limited to those that Harrison sent to SSR and MKR via email on February 13, 2018; January 3, 2019; April 1, 2019; March 1, 2020; May 18, 2020; May 27, 2020; June 24, 2020; and December 16, 2021 contained material fraudulent misrepresentations.

142.     For example, on May 18, 2020, Harrison sent, via email to Mr. Snider, what he claimed was a reconciliation of expenses incurred by Development Group (the "May 2020 Expenses").  The document Harrison sent was a single spreadsheet with no supporting receipts, invoices, or other documentation.  This spreadsheet contained material misrepresentations of expenses including, as described above, omitting numerous amounts paid out of the TD Bank Account including unexplained withdrawals and cashier's check fees.

143.     On December 16, 2021, Harrison sent, via email to Mr. Snider, another spreadsheet that he claimed was an updated version of the expenses incurred (the "December 2021 Expenses"). Harrison highlighted all entries after May 18, 2020 and indicated, in the email transmitting the spreadsheet, that these entries were the only changes from the May 2020 Expenses.

144.     This statement was false.  Indeed, on information and belief, both the May 2020 Expenses and December 2021 Expenses were fraudulent and contained numerous false and materially misleading representations about Development Group's expenses.

145.     Specifically, and for example, the May 2020 Expenses included entries on November 26, 2019 and November 29, 2019 purporting to reflect wire transfer payments that Harrison claimed to have made, from McKenzie Blake's Navy Federal Credit Union account to VHDA in the amounts of $201,875.00 and $553,125.00.  These expenses were recorded as being for "lender origination fee[s]."  In reliance on Harrison's representation that he had paid this total amount of $755,000, which comprised more than 18% of Development Group's total expenses at the time of the May 2020 Expenses, SSR and MKR agreed to contribute additional capital reflecting their proportionate share of the capital contributions.

146.     These expenses are completely absent from the December 2021 Expenses.  On information and belief, these expenses were not real, and Harrison used their inclusion on the May

2020 Expenses to fraudulently induce SSR and MKR to contribute capital that was not otherwise required.

147.     SSR and MKR requested additional documentation and financial records relating the Development Group's finances and, specifically, supporting the expenses included on both the May 2020 Expenses and the December 2021 Expenses. Harrison fraudulently represented that he would provide these records in order to induce SSR and MKR to continue contributing money and maintaining their investment.

148.     For example, on April 8, 2019, in response to SSR's request for all financial and business records of Development Group, Harrison sent a letter dated April 5, 2019 to SSR, via email, falsely stating that he would provide all financial and business records by April 11, 2019. By email to Mr. Snider on April 10, 2019, Harrison reiterated this promise to provide the requested records. Harrison did not provide the promised records. On information and belief, at the time he sent his April 5 letter, he did not intend to provide any of the requested records.

149.     Harrison similarly sent an email to SSR and MKR falsely promising to provide financial records and justification for expenses on September 17, 2021. Harrison never provided the promised records and, on information and belief, never intended to do so.

150.     Most recently, on March 25, 2022 and April 6, 2022, SSR and MKR, through counsel, requested that Harrison provide the financial records for Development Group, Developers, and the myriad separate bank accounts he has improperly used to commingle Development Group funds with those of his other businesses. By email to counsel on April 15, 2022, Harrison stated that he would provide a small subset of the requested records by May 1, 2022. As of the date of this Complaint, Harrison has provided no records.

151.     Harrison's refusal to provide financial records, despite the DG Operating Agreement and Developer Operating Agreement both explicitly requiring him to provide them, is part and parcel of his years long effort to defraud SSR and MKR and to hide that fraud.

(b)     *Denial of Benefits of Rent*

152.     After Development Group closed on the purchase of the Model Tobacco site in June 2020, it began receiving rent from a number of commercial tenants whose leases Development Group assumed from the prior owner.

153.     As members of Development Group, SSR and MKR were entitled to share in the benefit of this rent, including through periodic distributions of the income.  On February 6, 2020, Harrison acknowledged as much, stating to SSR and MKR, via email, that rent income would be distributed to Development Group's members on a quarterly basis.

154.     This statement was false; Harrison never provided any such distributions.  On information and belief, he retained all rent paid for his own benefit and that of his companies, including but not limited to CAHC, CAH and McKenzie Blake.  He further used a pattern of fraudulent communications to SSR and MKR to conceal his theft of this money.

155.     For example, on November 20, 2020, after SSR had inquired about the status of rent payments, Harrison emailed SSR and promised to address the handling of those payments in separate email correspondence.  Harrison never did so and, on information and belief, never intended to.

156.     On October 5, 2021, via another email from Harrison to SSR, in response to another request from SSR about the rental income, Harrison stated that the rental income was being used to cover "administrative expenses" with no further elaboration on what those expenses were.

157.     Notably, according to Harrison's own expense ledger, the only "admin costs" that Development Group incurred were those for which Harrison had Development Group pay $75,000 to CAHC, his own company, on October 8, 2020.

158.     Despite repeated demands by SSR and MKR for financial records, Harrison never accounted for the supposed "administrative expenses" that he claimed the rental income was covering or reflected that rental income in any of Development Group's financial records.

(c)     *Fraudulent Capital Account Reconciliations Steal $431,300*

159.     As described above, by the middle of 2018, Harrison, through 1814 Ingleside, was failing to make timely payments on the loans that Santorini Capital had extended to him for the purchase of the Ingleside Property.  Harrison was a personal guarantor of this loan.

160.     In the spring of 2020, the members of Development Group were preparing to finally close on the purchase of the Model Tobacco complex.  In preparation for the closing, SSR, MKR and Harrison were reviewing the Development Group capital accounts and assessing additional contributions needed to close.  As part of this review, Harrison proposed to grant SSR and MKR capital credit in the amount that was currently due on 1814 Ingleside's loans and reducing 1814 Ingleside's balance due accordingly.  SSR and MKR agreed in principal to this offset and the parties settled on an offset amount of $431,300.

161.     On April 6, 2020, Harrison sent an email to Mr. Snider confirming that parties' intent to offset $431,300 from 1814 Ingleside's past due loans against SSR and MKR's capital contribution accounts of Development Group.  Harrison further wrote that he "underst[ood] those figures need to be trued up and will work to do so in the coming weeks."

162.     On May 18, 2020, May 22, 2020, May 27, 2020, and June 9, 2020 Harrison sent additional emails to SSR.  In each email, Harrison discussed reconciliation of Development Group's capital accounts and included purported reconciliations of the members' capital

contributions but made no mention of the $431,300 credit he had promised to provide to SSR and MKR.

163.    On June 10, 2020, Harrison again emailed Mr. Snider and told him that, in preparation for closing on the Model Tobacco complex purchase, he would fund the TD Bank Account with the amount of his capital contribution plus the $431,300 being offset against his Ingleside debt.

164.    On June 15, 2020, Harrison sent another email acknowledging the offset agreement but insisting that his capital contribution exceeded what he owed and included a portion of the capital that SSR and MKR were required to contribute.

165.    On October 29, 2021, after SSR disputed a capital account reconciliation that Harrison provided, Harrison sent an email to Mr. Snider refuting SSR's disputes but stating that "the only discrepancy may be how we allocated the" Ingleside offset.

166.    In reliance on Harrison's representations that he would grant MKR and SSR credit for capital contributions in the amount of $431,300 in exchange for that amount being offset against 1814 Ingleside's debt, when Santorini Capital filed suit in February 2021 against 1814 Ingleside for its failure to pay the Promissory Notes, and Harrison as guarantor of those Notes, the amount it sought did not include the $431,300 that was meant to be offset against SSR and MKR's Development Group accounts.

167.    On information and belief, Harrison never intended to provide the promised $431,300 credit to the capital contribution accounts of SSR and MKR.  He sent each of the emails described above in furtherance of this scheme to defraud by falsely assuring SSR and MKR that they would be granted capital account credit, preventing them from taking action against him or

1814 Ingleside for the $431,300, and causing them to remain invested in and contributing additional capital to the Model Tobacco Project.

168.    His fraudulent scheme was successful: as a result of his lies and misrepresentations, Santorini Capital's judgment against him, which he continues to evade paying, is more than half a million dollars less than it would have been if it included the $431,300 plus prejudgment interest.

### H.    Harrison Purports To Dilute SS Richmond's and MK Richmond's Interest In Developer

169.    In December 2021, the relationship among SSR, MKR, and Harrison deteriorated significantly. After Harrison refused to provide any justification for millions of dollars in expenses beyond a spreadsheet that he himself had created, SSR and MKR indicated that they intended to invoke the DG Operating Agreement's third-party dispute resolution provision to assess the validity of those expenses and suggested that Harrison carefully review his claimed expenses. In response, on December 16, 2021, Harrison emailed SSR, copying MKR, and said "You should be careful as well. Your [sic] not as smart as you think you are."

170.    After additional dismissive responses to SSR and MKR's concerns in January 2022, and unable to stall any longer, in February 2022, Harrison sprung his trap.

171.    On February 23 2022, Harrison sent, via email to SSR, and subsequently by FedEx to both SSR and MKR, letters dated February 22, 2022 demanding, purportedly on behalf of Developer, that SSR and MKR pay $85,306.00 each "to cover your portion of the capital contribution … at the 2020 closings."

172.    This request, which purported to be a capital call by Developer, was false and fraudulent, and Harrison knew it to be false and fraudulent. Under the Developer Operating Agreement and DG Operating Agreement—or even the Fraudulent Agreements—Developer could not possibly have had any obligations at the time of the 2020 closings. Harrison's fraudulently

created backdoor to shift his obligations under the DG Operating Agreement to Developer, as described above, did not even come into existence until the time of the construction financing closing in October 2020.  Thus, even though there was no possible way that SSR or MKR could have owed capital to Developer for expenses existing at the time of that closing, Harrison sent this false and fraudulent capital call as part of his effort to steal as much of SSR's and MKR's interests in Developer as possible.

173.   The same email and FedEx shipments also included separate letters, dated February 23, 2022, purportedly on behalf of Developer, requesting that SSR and MKR contribute $400,004.31 as their proportionate share of certain expenditures.  As justification for the expenditures, Harrison attached a "Schedule of Contracts and Costs" under the heading "Model Tobacco Development Group LLC" that listed numerous expenses for, among other things, package lockers, mailboxes, security cameras, gym equipment, and a climbing wall.

174.   None of the expenses listed in the attachment to Harrison's February 23 letters to MKR and SSR are proper expenses of Developer.  Even beyond the fact that the list of expenses designates them as Development Group expenses, they all fall outside the scope of both the business purpose of Developers under its Operating Agreement and the Services Agreement.  Nor could Developer (or SSR or MKR as members of Developer) be liable for Development Group's "Excess Development Costs" as Developer did not actually execute the Fraudulent Agreements or have the authority to do so.  Even Development Group could not have lawfully incurred these obligations as the purported expenses were not included in the Development Group budget.

175.   These letters were transparent attempts by Harrison to use the backdoor he had created through the Fraudulent Agreements as a means of attempting to shift his own financial obligations to SSR and MKR and to usurp SSR and MKR's interests in the Model Tobacco Project.

176.     After Mr. Snider, on behalf of SSR, emailed Harrison demanding to know the basis for the unlawful capital call, Harrison replied, via email on February 23, 2022, snidely telling Mr. Snider "I suggest you reread all of the operating agreements," plainly referring to the Fraudulent Agreements.

177.     In a telephone conversation on February 25, 2022, Harrison doubled down on his smugness about what he clearly saw as his fait-accompli fraud, telling Mr. Snider: "I have signatures." Harrison's reference to "signatures" clearly referred to the signature pages he had defrauded SSR and MKR into signing.

178.     On March 2, 2022, Harrison again emailed Mr. Snider quoting the language that he had inserted into the Fraudulent Agreements by which, he claimed, SSR and MKR were liable for the Excess Development Costs, Developer "shall be required" to pay those Costs if Development Group requested payment from SSR and MKR and they failed to pay them, and Developer could make a capital call if Harrison "determine[d] additional funds are required by the Developer."

179.     After SSR and MKR responded to Harrison's brazen attempt to defraud them and rejected the provisions he added to the Fraudulent Agreements, on March 30, 2022, Harrison doubled down. Via separate emails to Mr. Snider and Mr. Kuehn, Harrison, ostensibly on behalf of CAH, sent letters to SSR and MKR stating that he had loaned money to Developer to cover SSR and MKR's supposed failure to pay the capital call and that he intended to convert that member loan into a capital contribution for 150% of the amount—plus interest to which he would not be entitled even if the Fraudulent Agreements were valid—pursuant to the Developer Operating Agreement. Harrison's pattern of fraud and deceit targeted at stealing Developer, Development Group, and the Model Tobacco Project from SSR and MKR had reached its goal.

# FIRST CLAIM FOR RELIEF

## Violation of Racketeer Influenced and Corrupt Organization Act,
## 18 U.S.C. §§ 1962(b), 1964(c)

180.    Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

181.    Beginning in 2017 and continuing to the present, Harrison, both individually and by and through CAH, CAHC, and McKenzie Blake, has used a pattern of racketeering activity to acquire and maintain an interest in and control of Development Group, Developers and the Model Tobacco Project.

182.    Development Group is a limited liability company comprised of three members and operated by a manager.  It is an enterprise within the meaning of 18 U.S.C. § 1961(4).

183.    Developers is a limited liability company comprised of three members and operated by a manager.  It is an enterprise within the meaning of 18 U.S.C. § 1961(4).

184.    The Model Tobacco Project is an association of limited liability companies, government entities, federally insured financial institutions and individuals who are collectively pursuing the purpose of developing a complex of residential and commercial real estate on the Model Tobacco Complex.  The members of the association have defined relationships with one another pursuant to legally binding agreements consisting of the DG Operating Agreement and the Developer Operating Agreement.  The association has existed since at least 2017 and continues to exist today.  The Model Tobacco Project comprises an enterprise within the meaning of 18 U.S.C. § 1961(4).

185.    Development Group, Developer, and the Model Tobacco Project are each engaged in interstate commerce and their activities affect interstate commerce.  They each include individuals located in different states, including Virginia, Maryland and the District of Columbia,

and have attracted investments and financing from across the United States, including loans from Allegany Federal Credit Union in North Carolina and Cedar Rapids Bank and Trust in Iowa.

186.     Harrison both individually and by and through CAH, CAHC, and McKenzie Blake has engaged in a pattern of racketeering activity to acquire and maintain an interest in and control over the Model Tobacco Project.

187.     Specifically, as described above in Section VI.A, in September 2017, Harrison used transmissions via wire in interstate commerce to fraudulently induce Mr. Sushner to "invest" $50,000 in a fictitious company. This conduct constituted wire fraud in violation of 18 U.S.C. § 1343.

188.     In furtherance of this fraudulent scheme Harrison sent additional transmissions via wire in interstate commerce to fraudulently prevent Mr. Sushner from detecting that Harrison had stolen his $50,000 using a fake company, including on August 17, 2018, February 15, 2019, and September 20, 2019. Each of these communications constituted wire fraud in violation of 18 U.S.C. § 1343.

189.     On information and belief, Harrison used the $50,000 he stole from Mr. Sushner as seed money with which to further his fraudulent scheme by subsequently seeking the investments from SSR and MKR that are the subject of this lawsuit.

190.     After SSR and MKR invested in Development Group and the Model Tobacco Project, Harrison continued to use a pattern of wire fraud, mail fraud, and bank fraud to fraudulently induce them to continue contributing capital to the Project, maintain his control over the Project, and then, ultimately, to unlawfully steal their interests in the Project.

191.     Specifically, as described *supra* in paragraphs 69-72, on February 22, 2018, Harrison falsely represented the amount of money he had "contributed" (via unaudited expenses

for which he claimed credit), thereby inducing SSR and MKR to contribute capital to Development Group that was not properly due. This conduct constituted wire fraud in violation of 18 U.S.C. § 1343.

192. As described *supra* in paragraphs 84-86, in March and April 2019, Harrison sent communications in the U.S. mail and by wire in interstate commerce fraudulently representing that fees required to extend the closing—extensions only required because of Harrison's failure to perform his contractual obligations—were in fact deposits that would be credited against the eventual purchase of the Model Tobacco complex. In reliance on these false representations, SSR and MKR continued to contribute to Development Group as the truth of the dramatically escalating costs was hidden from them. Harrison's conduct constituted mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

193. As described *supra* in Section VI.D, in furtherance of his scheme to defraud and his effort to acquire and maintain his interest in and control Development Group and the Model Tobacco Project, Harrison used communications sent via wire in interstate commerce to fraudulently induce the Raikas into agreeing to serve as co-guarantors. Without such fraudulently procured co-guarantors, Harrison's failure to perform his obligations to SSR and MKR under the DG Operating Agreement would have been made plain and Harrison would have lost his interest in and control of both Development Group and the Project. This conduct constituted wire fraud in violation of 18 U.S.C. § 1343.

194. As described *supra* in paragraphs 102-103, in order to induce the Raikas to serve as co-guarantors, Harrison caused Development Group to pay them $25,000, which payment was not an authorized Development Group expense. Harrison was aware that the $25,000 was the proceeds of his scheme to defraud SSR and MKR when he transferred the funds to the Raikas.

Harrison made the payment with the intent to promote the carrying on of his continuing scheme to defraud SSR and MKR. This payment was executed using interstate wires. This conduct constituted wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1956.

195. As described *supra* in Section VI.F, Harrison used communications sent by Fedex, a commercial interstate carrier, and by electronic mail, transmitted via wire in interstate commerce, in furtherance of a scheme to defraud SSR and MKR by procuring their signatures on documents he subsequently attached to the Fraudulent Agreements. These Fraudulent Agreements provided the mechanism by which Harrison purported to steal the interests of SSR and MKR in Developer, Development Group and the Project. Harrison's conduct constituted fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

196. As described *supra* in Section VI.G.1.c, on at least 34 instances between March 6, 2018 and October 8, 2020, Harrison obtained money, funds, and credits from the TD Bank Account under the false pretense that he was authorized to make those withdrawals and by falsely representing to TD Bank that he was authorized to withdraw funds from Development Group's TD Bank Account. The DG Operating Agreement requires that two members sign for any withdrawal from a Development Account, but no second signature was provided for any of these transactions. Moreover, 17 of the unauthorized TD Bank Account transactions exceeded $50,000, for which the DG Operating Agreement required the authorization of SSR and MKR. SSR and MKR did not provide authorization for any of those transactions. Each of these 34 transactions constituted bank fraud in violation of 18 U.S.C. § 1344.

197. As described *supra* in Section VI.G.2.a, on at least February 13, 2018; January 3, 2019; April 1, 2019; March 1, 2020; May 18, 2020; May 27, 2020; June 24, 2020; and December

16, 2021 Harrison used transmissions via wire in interstate commerce in furtherance of a scheme to defraud SSR and MKR by providing them with false expense reports in order to conceal Harrison's fraud and prevent SSR and MKR from interfering with his control over Development Group and the Project. These transmissions constituted wire fraud in violation of 18 U.S.C. § 1343.

198.     As described *supra* in paragraphs VI.G.2.c, between April 2020 and the present, Harrison has used a series of transmissions via wire in interstate commerce and by U.S. mail to fraudulently induce SSR and MKR into having Santorini Capital reduce 1814 Ingleside and Harrison's past due amount on the Promissory Notes without ever providing the offsetting credit to SSR and MKR's Development Group capital accounts. Through Harrison's fraudulent representations that he would provide such credit, he defrauded SSR and MKR of $431,300. This conduct constituted wire fraud in violation of 18 U.S.C. § 1343.

199.     SSR and MKR have been injured by Harrison's pattern of racketeering activity. Through his effort to acquire and maintain his interest in and control of Development Group, Developer and the Model Tobacco Project, Harrison fraudulently induced SSR and MKR into investing approximately $4 million into the Project, improperly used Project funds to maintain his own control through, for example, paying for a co-guarantor, and deprived them of their interests in Developer, which he has usurped for himself. In addition to the injury SSR and MKR have suffered through the funds they invested that Harrison has fraudulently misused, SSR and MKR's investment in the Model Tobacco Project is worth substantially less due to Harrison's pattern of racketeering activity.

## SECOND CLAIM FOR RELIEF

### Securities Fraud (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5)

200.     Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

201.    In 2017, Harrison and CAHC used repeatedly false and fraudulent statements, transmitted through the means and instrumentalities of interstate commerce, in order to induce SSR and MKR to purchase interests in Development Group.

202.    As described above in Section VI.B, in connection with SSR and MKR's purchase of interests in Development Group, Harrison falsely represented including via telephone calls and via emails:

    a.    That the Model Tobacco Project was "shovel ready;"

    b.    That Harrison had secured debt financing for the purchase of the Model Tobacco site and construction of the Project;

    c.    That SSR and MKR would not be required to invest more than $1.6 million into the Project;

    d.    That Development Group's purchase of the Model Tobacco site would close in the first or second quarter of 2018;

    e.    That construction on the Model Tobacco Project would begin in spring 2018;

    f.    That construction of the Model Tobacco Project would be complete in 2019; and

    g.    That SSR and MKR would begin realizing returns on their investment by late 2019.

203.    Harrison made these false representations with the intent that they would induce SSR and MKR to invest in Development Group.

204.    SSR and MKR's interests in Development Group are investment contracts and therefore "securities" as Section 78c of Title 15 of the U.S. Code defines that term.

205.    The interests involved the investment of money.   Specifically, through the DG Operating Agreement, SSR and MKR committed to investing note more than $1.6 million into Development Group.  Between 2018 and 2021, SSR and MKR did, in fact, invest nearly $4 million into Development Group.

206.    Development Group is a common enterprise among SSR, MKR and Harrison, in his own right and through CAHC, CAH, and McKenzie Blake, with the common purpose of developing the Model Tobacco Project.

207.    SSR and MKR invested in Development Group with the expectation of profit, as projected by financial reports Harrison provided to them at the time that he was soliciting their investments.

208.    The profits SSR and MKR expected to receive from their investment in Development Group were to be derived from the efforts of Harrison, both individually and through CAHC, CAH and McKenzie Blake.  Harrison represented that he was an experienced and skilled real estate developer with substantial experience successfully developing projects similar to Model Tobacco.  Under the terms of the DG Operating Agreement, Harrison, though his companies, was to serve as manager of Development Group and as the individual with overall responsibility for seeing the Model Tobacco Project through to fruition.

209.    SSR and MKR purchased their interests in Development Group in reliance on Harrison's fraudulent representations.  But for Harrison's false representations, neither SSR nor MKR would have invested in Development Group.

210.    Harrison's false representations caused significant economic harm to SSR and MKR including, but not limited to loss of the capital they have invested into Development Group including the $1.6 million initial investment and the nearly $3 million in additional capital above

their mandatory contributions that they paid in reliance on Harrison's continuing false representations.

## THIRD CLAIM FOR RELIEF

### Breach of Contract
### (Development Group Operating Agreement)

211. Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

212. The DG Operating Agreement is a binding contract to which Harrison, through CAHC, CAH, and McKenzie Blake, was a party.

213. Harrison agreed to the terms of the DG Operating Agreement and executed that Agreement on December 29, 2017.

214. Harrison, CAHC, CAH, and McKenzie breached the following provisions of the DG Operating Agreement:

      a.      Section 4.40(c) by failing to exercise good faith;

      b.      Section 7.01(a) by failing to require two signatures for all payments from Development Group bank accounts;

      c.      Section 7.01(b) by taking performing transactions with Harrison's affiliates and entering contracts and incurring obligations exceeding $50,000 without the authorization of all members;

      d.      Section 8.02 by failing to provide financial statements; and

      e.      Section 8.04 by commingling Development Group funds with personal funds and funds of other of Harrison's companies.

215. Harrison's willful and repeated breaches of the DG Operating Agreement constituted willful misconduct and gross negligence.

216. Harrison's breaches of the DG Operating Agreement caused damage to SSR and MKR by improperly spending their capital contributions, causing them to contribute more capital than would have been required by the operation of Development Group in accordance with its Operating Agreement, and decreasing the value of their investment in Development Group.

## FOURTH CLAIM FOR RELIEF

### Breach of Contract
### (Developer Operating Agreement)

217. Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

218. The Developer Operating Agreement is a binding contract to which Harrison, through CAHC, CAH, and McKenzie Blake, was a party.

219. Harrison agreed to the terms of the Developer Operating Agreement and executed that Agreement on September 13, 2019.

220. Harrison, CAHC, CAH, and McKenzie breached the following provisions of the DG Operating Agreement:

a.      Section 4.40(c) by failing to exercise good faith;

b.      Section 7.01(b) by performing transactions and incurring obligations exceeding $50,000 without the authorization of all members;

c.      Section 8.02 by failing to provide financial statements; and

d.      Section 8.04 by commingling Developer funds with personal funds and funds of other of Harrison's companies.

221. Harrison's willful and repeated breaches of the Developer Operating Agreement constituted willful misconduct and gross negligence.

222. Harrison's breaches of the Developer Operating Agreement caused damage to SSR and MKR by improperly spending their capital contributions, causing them to contribute more

capital than would have been required by the operation of Developer in accordance with its Operating Agreement, and decreasing the value of their investment in Developer.

## FIFTH CLAIM FOR RELIEF

### Fraud

223.    Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

224.    Between April 2020 and October 2021, Harrison represented to SSR and MKR that he was crediting them with $431,300 in their Development Group capital accounts to offset a corresponding reduction of 1814 Ingleside's debt to Santorini Capital under the Promissory Notes.

225.    These representations were false. Harrison did not, and never intended to, credit SSR and MKR's capital accounts with the $431,300.

226.    At the time Harrison made each of these representations, he knew they were false. He intentionally made these false representations as part of his scheme to defraud SSR and MKR and steal $431,300 from them.

227.    In reasonable reliance on Harrison's false representations, SSR and MKR had Santorini Capital reduce 1814 Ingleside's past due amount on the Promissory Notes by $431,300 and, when Santorini filed suit against Harrison and 1814 Ingleside in February 2021, it excluded this amount from its claim and eventual judgment.

228.    As a result of Harrison's fraudulent misrepresentations, SSR and MKR have suffered damage in the $431,300 that has been stolen from them and the interest they lost by not continuing to pursue that amount from 1814 Ingleside and Harrison in litigation.

## SIXTH CLAIM FOR RELIEF

### Dissociation of Defendants from Development Group (Va. Code § 13.1-1040.1(5))

229.    Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

230.     Through his pattern of fraud against Mr. Sushner, the Raikas, SSR and MKR, Harrison, individually and through CAHC, CAH, and McKenzie Blake, has engaged in wrongful conduct that has materially and adversely affected the business of Development Group.  As a direct result of Harrison's wrongful conduct including unauthorized expenses and financial transactions, Development Group has been deprived of capital it requires for its business operations, impairing its ability to complete the Model Tobacco Project.   Harrison's wrongful conduct has also jeopardized Development Group's relationships with the financial institutions and Virginia state agencies that provided debt financing for the Model Tobacco Project, creating the risk that the company will lack the funding to complete the Project.

231.     Harrison, individually and through CAHC, CAH, and McKenzie Blake, has also willfully and persistently committed material breaches of the DG Operating Agreement, including in all the ways described above.

232.     Harrison's conduct related to the business of Development Group, included his systematic pattern of fraud, has made it not reasonably practicable to carry on the business of Development Group with him.

### SEVENTH CLAIM FOR RELIEF

#### Dissociation of Defendants from Developer
#### (Va. Code § 13.1-1040.1(5))

233.     Plaintiffs incorporate paragraphs 1-179 as though fully set forth herein.

234.     Through his pattern of fraud against Mr. Sushner, the Raikas, SSR and MKR, Harrison, individually and through CAHC, CAH, and McKenzie Blake, has engaged in wrongful conduct that has materially and adversely affected the business of Developer.  As a direct result of Harrison's wrongful conduct including unauthorized expenses and financial transactions,

Developer has been deprived of capital it requires for its business operations, impairing its ability to complete the Model Tobacco Project.

235.     Harrison, individually and through CAHC, CAH, and McKenzie Blake, has also willfully and persistently committed material breaches of the Developer Operating Agreement, including in all the ways described above.

236.     Harrison's conduct related to the business of Developer, including his systematic pattern of fraud, has made it not reasonably practicable to carry on the business of Developer with him.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

a.     An award of actual, presumed, general and special damages as allowed by law and, as applicable, to be proven at trial;

b.     An award of punitive damages;

c.     An award of treble the damages caused by Defendants' pattern of racketeering activity, pursuant to 18 U.S.C. § 1964(c);

d.     An award of costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

e.     An order dissociating Defendants from Development Group;

f.     An order dissociating Defendants from Developer; and

g.     Any other relief the Court deems just and appropriate.

Dated: May 31, 2022
Richmond, VA

Respectfully submitted,

/s/ Patrick Stafford

Patrick Stafford (VA State Bar No. 84490)
Keith H. Forst (*pro hac vice* forthcoming)
Nicholas J. Inns (*pro hac vice* forthcoming)
Paul D. Henderson (*pro hac vice* forthcoming)
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000 (tel.)
(202) 538-8100 (fax)
patrickstafford@quinnemanuel.com
keithforst@quinnemanuel.com
nicholasinns@quinnemanuel.com
paulhenderson@quinnemanuel.com

*Attorneys for Plaintiffs*