IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SS RICHMOND LLC,
MK RICHMOND LLC,
     Plaintiffs,

     v.                                Civil No. 3:22cv405 (DJN)

CHRISTOPHER A. HARRISON,
THE C.A. HARRISON COMPANIES, LLC,
CAH MODEL TOBACCO, LLC,
McKENZIE BLAKE DEVELOPMENT COMPANY,
LLC,
     Defendants.

## MEMORANDUM OPINION

Plaintiffs SS Richmond LLC ("SSR") and MK Richmond LLC ("MKR") (together, "Plaintiffs"), bring this action against Defendants Christopher A. Harrison ("Harrison"), The C.A. Harrison Companies, LLC ("CAHC"), CAH Model Tobacco, LLC ("CAH"), and McKenzie Blake Development Company, LLC ("MBDC") (collectively, "Defendants") alleging violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1962(a), 1964(c), securities fraud, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, and dissociation claims, Va. Code § 13.1-1040.1(5), as well as common law breach of contract, fraud and fraud by concealment claims. Defendants bring counterclaims against Plaintiffs in the same action, seeking dissociation of Plaintiffs from Model Tobacco Developer, LLC ("Developer") and Model Tobacco Development Group, LLC ("MT Development") under Va. Code § 13.1-1040.1, a request for a declaration of rights as to the validity of the Amended and Restated Operating Agreement of Model Tobacco Development Group, LLC ("Amended Operating Agreement"), and common law breach of contract. This matter now comes before the Court on Defendants'

Motion to Dismiss the Amended Complaint (ECF No. 44) and Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaim (ECF No. 41).

For the reasons set forth below, the Court will DENY Defendants' Motion to Dismiss. Additionally, the Court will GRANT Plaintiffs' Motion to Dismiss Defendants' Counterclaim. This case shall proceed on Counts One through Eight of the Amended Complaint against Defendants and Counterclaims One and Three against Plaintiffs.

## I.    BACKGROUND

This breach of contract, fraud, securities fraud and RICO action arises out of Defendants' alleged series of fraudulent transactions relating to the development of the Model Tobacco Project. Defendants' alleged fraud and embezzlement induced Plaintiffs to invest millions of dollars into the Project which Plaintiffs seek to recover.

### A.    Factual Background

At this stage, the Court must accept as true the facts set forth in the Amended Complaint (ECF No. 35). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant motion.

The Amended Complaint alleges that Harrison, individually and by and through CAH, CAHC and MBDC, entities of which he is the owner, manager and sole member, systematically conducted "a pattern of bank fraud, wire fraud, mail fraud and money laundering in an effort to seize control of and increase his interest in a project to purchase and refurbish a closed tobacco manufacturing facility" (the "Model Tobacco Project," the "Project" or "Model Tobacco") with SSR and MKR, his partners. (Am. Compl. ¶ 1.) Model Tobacco Project is a fifteen-acre collection of seven buildings in Richmond, Virginia, centered around the Model Tobacco Building that previously served as a factory for the United States Tobacco Company. (Am.

2

Compl. ¶ 29.)  In 2017, Defendants Harrison and CAHC became interested in acquiring the property and converting the buildings into an apartment complex.  (Am. Compl. ¶ 30.)  In mid-2017, Harrison approached non-party Mr. Steven Sushner to invest in Model Tobacco, offering him a four percent stake in "Model Tobacco Lofts LLC" in exchange for a $100,000 investment. (Am. Compl. ¶ 32-33.)  Sushner sent $50,000 via wire transfer, but never received the "paperwork" regarding Model Tobacco Lofts LLC or Model Tobacco Lofts Development LLC, as neither company was registered with the Commonwealth of Virginia at the time.  (Am. Compl. ¶ 36-38.)  The "loan" has never been returned to Mr. Sushner.  (Am. Compl. ¶ 44.)

Harrison and CAHC then approached Mr. Snider and Mr. Keuhn, the owners of SSR and MKR, respectively, to invest in Model Tobacco, given their partnership with Harrison on another real estate deal.  (Am. Compl. ¶¶ 47-48.)  During phone calls in September 2017, Harrison told SSR and MKR that the "shovel-ready" Project had debt-financing in place for purchase of the site and construction and that the acquisition would close in "early 2018."  (Am. Compl. ¶ 47.) On September 14, 2017, Harrison emailed to Plaintiffs the Project's Offering Memorandum, which represented project completion by "late 2019."  (Am. Compl. ¶ 53.)  On October 7, 2017, Harrison emailed Plaintiffs a "Bank Package" with a project description and financing projections, which forecasted the site purchase in the second quarter of 2018, a March 1, 2018 construction start date, a completion date of September 1, 2019, and post-development rental income beginning in 2019.  (Am. Compl. ¶¶ 53, 55.)  On December 19, 2017, Harrison revised the "Bank Package," moving up the closing date to the first quarter of 2018 while the rest of the timeline remained the same.   (Am. Compl. ¶ 56.)   As a result of these representations, Plaintiffs allege that they believed their investments would yield returns by late 2019. (Am. Compl. ¶ 57.) Further, Plaintiffs allege that Harrison knew the falsity of the timeline and the Project's shovel-

3

readiness, but misrepresented these facts to Plaintiffs to procure a $1.6 million investment. (Am. Compl. ¶¶ 58-59, 78.)

On December 29, 2017, the parties formed Model Tobacco Development Group LLC ("MT Development") and executed the Development Group Operating Agreement ("Operating Agreement" or the "Agreement"). (Am. Compl. ¶ 59.) The Agreement capped mandatory capital contributions from members at $1,637,136.00, and Harrison promised to provide guarantees himself to complete the residential portion of the project. (Am. Compl. ¶ 63.) The Agreement also mandated that Harrison provide Plaintiffs with MT Development's financial statements and other necessary reports to monitor progress. (Am. Compl. ¶ 64.) On February 16, 2018, Plaintiffs, Harrison and CAHC opened a bank account for MT Development at TD Bank. (Am. Compl. ¶ 65.) Plaintiffs contributed their mandatory capital contributions, while Harrison claimed that prior expenses on personal credit cards or other companies' bank accounts satisfied his contribution. (Am. Compl. ¶¶ 67-68.) Plaintiffs allege that Harrison behaved similarly or falsely claimed to contribute capital more than a dozen times between 2018 and 2021 to avoid the Operating Agreement's financial controls. (Am. Compl. ¶¶ 73-75.)

Additionally, the Project failed to proceed pursuant to the projected timeline. On March 25, 2019, Harrison mailed a letter to Plaintiffs that represented that MT Development would acquire the Model Tobacco site by June 15, 2019, with construction beginning at the end of the month. (Am. Compl. ¶¶ 79-80.) Plaintiffs allege that Harrison knew the timeline's impossibility, because he had secured no financing at the time. (Am. Compl. ¶ 81.) Instead, MT Development did not close on the purchase until June 2020, which Plaintiffs allege cost the parties an additional $1.25 million in extension fees, although Harrison labeled the fees as recoverable deposits. (Am. Compl. ¶¶ 86-87.)

On April 19, 2019, Harrison and CAHC, unbeknownst to Plaintiffs, executed a document styled as the "First Amendment" to Model Tobacco Development Lofts LLC's operating agreement,[1] which promised to pay non-parties Kamran and Ana Raika a fee of $250,000 to serve as guarantors for the Model Tobacco Project. (Am. Compl. ¶ 94.) Harrison paid the first installment using MT Development money, without Plaintiffs' approval and despite Model Tobacco Development Lofts LLC not being a member of MT Development, nor a party to the contract. (Am. Compl. ¶¶ 95, 104.)

On September 13, 2019, the parties created Model Tobacco Developer, LLC ("Developer") and signed an operating agreement ("Developer Agreement"), which required all members' authorization for transactions and obligations exceeding $50,000, mandated that Plaintiffs receive financial statements and prohibited commingling Developer funds with other companies. (Am. Compl. ¶ 108.)

On October 27, 2020, MT Development closed on the construction financing for the Project. (Am. Compl. ¶ 112.) As part of closing, Plaintiffs received a packet containing the first page and signature pages of each document requiring signature and an email link to download over 2,200 pages of documents related to the closing. (Am. Compl. ¶ 115.) Included among the documents received was an "Amended and Restated Operating Agreement," with no further explanation of the amendments. (Am. Compl. ¶ 115.) Notwithstanding the amendments, the Plaintiffs' signature pages to the Amended Operating Agreement contained the title for the original, unamended agreement, while Harrison's remained correctly labeled. (Am. Compl.

---

[1]     Plaintiffs allege that the First Amendment refers to an original operating agreement executed on November 10, 2017, but the agreement "is not executed by and does not include reference to any members other than CAHC and [the Raikas' entity]. [MT Development] is not a member of and did not execute any operating agreement related to Model Tobacco Lofts Development LLC." (Am. Compl. ¶¶ 94-95.)

¶¶ 116, 121.)  Plaintiffs thus executed the signature pages while unaware of a significant new obligation:   the Amended Operating Agreement required that Plaintiffs, as well as Developer, fund any "excess development costs" of the Project. (Am. Compl. ¶¶ 124-25.)

Plaintiffs further allege that between 2018 and 2022, Defendants engaged in a series of fraudulent transactions resulting in millions of dollars of "embezzlement, unauthorized expenses and self-dealing," including the theft of $431,300 that Harrison failed to credit to Plaintiffs' capital accounts. (Am. Compl. ¶ 127.)   Plaintiffs allege that between August 29, 2017, and December 16, 2021, Harrison conducted at least 425 transactions on behalf of MT Development using accounts belonging to himself, CAHC, CAH, MBDC or other entities that he controlled. (Am. Compl. ¶ 152.)  Four of these transactions related exclusively to Harrison's personal expenses. (Am. Compl. ¶¶ 156-60.)  Plaintiffs maintain that between March 6, 2018, and October 8, 2020, Harrison additionally withdrew funds from the MT Development bank account at least thirty-three times without Plaintiffs' approval and made seven additional payments on behalf of MT Development using commingled funds. (Am. Compl. ¶¶ 161, 163.)

Harrison allegedly misled Plaintiffs about the funds, their usage and the need for additional capital contributions by using fraudulent accounting records. (Am. Compl. ¶ 165.) He produced documents showing "Total Expenses" of the Model Tobacco Project via email on February 13, 2018; January 3, 2019; April 1, 2019; March 1, 2020; May 18, 2020; June 24, 2020; and December 16, 2021, but refused to provide documentation related to the purported expenses. (Am. Compl. ¶¶ 176-77.)

Plaintiffs also allege embezzlement related to eight parcels of land immediately northwest of the Model Tobacco Project (the "Brinser Street Property"). (Am. Compl. ¶ 128.) The Complaint alleges that Harrison told Plaintiffs that he would alert them when the property

became available such that he could purchase it for the benefit of the Model Tobacco Project. (Am. Compl. ¶ 129.)  Instead, Harrison purchased the Brinser Street Property in early 2018, without informing Plaintiffs and despite using MT Development's money deposited in the TD Bank account.  (Am. Compl. ¶¶ 132-33, 137.)  He noted the transaction in the MT Development ledgers and used it to induce additional capital contributions from Plaintiffs.  (Am. Compl. ¶ 167.)

Further, Plaintiffs allege that in June 2020, MT Development began to receive rent from prior commercial tenants whose leases MT Development assumed.  (Am. Compl. ¶ 178.) Harrison stated that rent would be distributed on a quarterly basis to members, but Plaintiffs never received distributions.  (Am. Compl. ¶¶ 179-80.)

By December 2021, Plaintiffs' relationship with Harrison soured.  Plaintiffs grew skeptical of Harrison's refusal to produce documentation regarding MT Development's expenses and urged him to be careful.  (Am. Compl. ¶ 195.)  Harrison emailed them, "You should be careful as well.  Your [sic] not as smart as you think you are." (Am. Compl. ¶ 195.)  The same email, dated February 23, 2022, requested that SSR and MKR contribute $400,004.31 as their proportionate share of expenses as Developer members.  (Am. Compl. ¶ 199.)  The attached expenditure "Schedule of Contracts and Costs," under the heading "Model Tobacco Development Group LLC," listed expenses for items such as "package lockers, mailboxes, security cameras, gym equipment, and a climbing wall."  (Am. Compl. ¶ 199.)  These expenses (1) fall outside of the business purpose of Developer and (2) cannot be attributed to Developer, because Developer is not a member of MT Development, whose "Excess Development Costs" were at issue.  When Plaintiffs refused to pay, Harrison diluted Plaintiffs' interests in Developer and increased his own.  (Am. Compl. ¶ 205.)

### B.     Procedural History

### 1.     Motion to Dismiss Amended Complaint

On May 31, 2022, Plaintiffs filed their Complaint (ECF No. 1), raising seven counts for relief based on the above allegations.  On July 27, 2022, Plaintiffs filed an Amended Complaint, now raising eight claims against Defendants. (ECF No. 35.)  The counts are as follows.  Count One brings a RICO claim against Harrison, both individually and by and through CAH, CAHC and MBDC, alleging a pattern of racketeering activity to acquire and maintain interest in and control of Developer, MT Development and the Model Tobacco Project.  (Am. Compl. ¶ 207.) Count Two alleges that Harrison and CAHC used false and fraudulent statements to induce SSR and MKR to purchase interests in MT Development, violating federal securities fraud laws. (Am. Compl. ¶ 228.)  Count Three claims a common law breach of contract of MT Development's Operating Agreement by Harrison, CAHC, CAH and MBDC.  (Am. Compl. ¶ 241.)  Count Four brings a breach of contract claim regarding the Developer's Operating Agreement by Harrison, CAHC, CAH and MBDC.  (Am. Compl. ¶ 247.)  In the Count Five fraud claim, Plaintiffs allege that Harrison falsely represented credits in Plaintiffs' MT Development capital accounts to offset a corresponding reduction of debt in another project. (Am. Compl. ¶ 251.)  Count Six seeks disassociation of Defendants from MT Development, based on the above alleged conduct.  (Am. Compl. ¶ 257.)  Count Seven seeks disassociation of Defendants from Developer.  (Am. Compl. ¶ 261.)  Finally, Count Eight alleges that Harrison committed fraud by concealment with regard to the Brinser Street Property.  (Am. Compl. ¶ 265-72.)  Based upon the foregoing claims, Plaintiffs seek an award of damages, punitive damages and treble damages arising from Defendants' pattern of racketeering activity, an award of costs and attorneys' fees, an order disassociating Defendants from MT Development, an order

8

disassociating Defendants from Developer and any other relief that the Court deems appropriate. (Am. Compl. at 61.)

On August 10, 2022, Defendants filed Defendants' Motion to Dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (ECF No. 44.) Defendants argue that Plaintiffs fail to allege a pattern of racketeering activity under Count One. (Mem. in Supp. of Defs.' Mot. to Dismiss ("MTD") (ECF No. 45) at 7.) Defendants further argue that Count Two is barred by the applicable statute of limitations, that Plaintiffs fail to plead fraud with particularity and that contracts between the parties superseded prior statements. (MTD at 11, 13, 17.) Defendants also challenge the state law fraud claims on the grounds that Plaintiffs insufficiently plead facts to support a claim and that the alleged fraud arises out of a breach of contract, which Virginia law bars. (MTD at 18, 20.) They additionally argue that the factual allegations fail to support a claim for fraud with regard to the Amended Operating Agreement. (MTD at 23.) And, lastly, Defendants argue that any other state law claims should be dismissed for lack of subject matter jurisdiction. (MTD at 26.) Defendants also move the Court to consider Defendants' Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure (ECF No. 46) and the attached affidavits in conjunction with the Motion to Dismiss.[2] (MTD at 27.) On August 25, 2022, Plaintiffs filed Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. (ECF No. 50.) On August 30, 2022, Defendants filed their Reply in Support of Motion to Dismiss Amended Complaint (ECF No. 52), rendering Defendants' Motion to Dismiss ripe for review.

---

[2]     The Court denied Defendants' Motions for Sanctions (ECF Nos. 46, 54) on October 17, 2022, nullifying this request. (ECF No. 69.)

### 2.     Motion to Dismiss Amended Counterclaims

On July 18, 2022, Defendants filed an Amended Answer to Complaint and Counterclaims.  (ECF No. 31.)  Defendants bring three counterclaims against Plaintiffs. Defendant's First Cause of Action and Request for Declaration of Rights seeks to deny fraud on the part of Harrison and CAH and request that the Court rule on the validity of the Amended Operating Agreement.  (Def. Am. Counterclaims ("Def. Am. CC") (ECF No. 31) ¶ 25.)  The Second Cause alleges a common law breach of contract of the Amended Operating Agreement by Plaintiffs.  (Def. Am. CC ¶ 30.)  Claim Three seeks disassociation of Plaintiffs from Developer and MT Development, as a result of the aforementioned allegations.  (Def. Am. CC ¶ 51.)  On August 1, 2022, Plaintiffs filed their Answer to Amended Counterclaims.  (ECF No. 43.)

On August 1, 2022, Plaintiffs filed Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaim (ECF No. 41), moving the Court to dismiss Defendants' Second Cause of Action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for failure to allege sufficient facts for a breach of contract claim and a lack of injury sufficient to confer standing.  On August 15, 2022, Defendants filed their Response to the Plaintiffs' Motion to Dismiss/Notice of Intent to File Amended Counterclaims.  (ECF No. 48.)  On August 22, 2022, Plaintiffs filed Plaintiffs' Reply in Support of Motion to Dismiss Defendants' Amended Counterclaim (ECF No. 49), rendering Plaintiffs' Motion to Dismiss Defendants' Counterclaims ripe for review.

### I.     STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v.*

*Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the plaintiff's well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *White v. CMA Constr. Co.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted). When a

11

defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the court applies a standard patterned on Rule 12(b)(6) and assumes the truthfulness of the facts alleged in the complaint. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

### III.     ANALYSIS

The Court begins by discussing Defendants' Motion to Dismiss the Amended Complaint, first taking up the RICO claim before moving to the securities fraud claim and then the state law fraud, breach of contract and dissociation claims. The Court will address the merits of the federal law claims first, as Defendants' jurisdictional argument assumes dismissal of the federal claims. *See Waybright v. Frederick Cty.*, 528 F.3d 199, 209 (4th Cir. 2008) ("With all [of a case's] federal questions gone, there may be the authority to keep [the case] in federal court under 28 U.S.C. §§ 1367(a) and 1441(c), but there is no good reason to do so.") (cleaned up); *see also Farlow v. Wachovia Bank of N.C., N.A.*, 259 F.3d 309, 316 (4th Cir. 2001) (noting that although the district court has the right to decide pendent claims, "'[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well'") (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

Next, the Court turns to Plaintiffs' Motion to Dismiss Defendants' Counterclaim, addressing standing, before discussing the merits. *See Griffin v. Dep't of Labor Fed. Credit Union*, 293 F. Supp. 3d 576, 578 (E.D. Va. 2018), *aff'd*, 912 F.3d 649 (4th Cir. 2019) (addressing standing arguments first, because an absence of standing deprives the court of the power to adjudicate anything further about the claim); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

### A.    Amended Complaint

#### 1.    RICO Claim

Defendants argue that Plaintiffs failed to state a pattern of racketeering activity sufficient to give rise to a RICO claim. The Court disagrees and finds that Plaintiffs plausibly state a claim for violations of the RICO Act against Defendant Harrison, both individually and by and through CAH, CAHC and MBDC. The Court therefore DENIES Defendants' Motion to Dismiss as to Count One.

A violation of § 1962 "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Defendants attack Plaintiffs' third prong, "through a pattern."[3] (MTD at 8.)

The RICO statute "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *U.S. Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (internal quotations omitted). Thus, to show "a pattern of racketeering activity," a plaintiff must allege "at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C.

---

[3]     Defendants only challenge Plaintiffs' failure to outline a pattern of racketeering activity. They do not challenge the other three prongs of a RICO claim. As such, the Court does not analyze the sufficiency of the other three prongs.

§ 1961(5). Additionally, the plaintiff "must show 'continuity plus relationship,' i.e., 'that the racketeering predicates are related, and that they amount to or pose a threat of continued activity.'" *AWAPPA*, 615 F.3d at 318 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "'So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern . . . .'" *Sedima, S.P.R.L.*, 473 U.S. at 497 (citing 116 Cong. Rec. 18940 (1970) (statement of Sen. McClellan)).

Related acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (internal quotations omitted). Defendants do not dispute that the alleged predicates constitute related acts. Instead, the Motion to Dismiss focuses solely on the alleged lack of continuity of the "pattern" of racketeering activity. (MTD at 7-11.) Regardless, undoubtedly, Plaintiffs allegations satisfy the relatedness prong, as all allegations relate to the Model Tobacco Project.

Continuity exists as "centrally a temporal concept" and ensures that only "long-term criminal conduct" falls within the ambit of the statute. *Borg v. Warren*, 545 F. Supp. 3d 291, 315 (E.D. Va. 2021) (quoting *H.J. Inc.*, 492 U.S. at 242). As the Supreme Court explained in *H.J. Inc.*, continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241. A plaintiff can show closed-ended continuity through "a series of related predicates extending over a substantial period of time" or open-ended continuity by proving that a defendant's past acts pose threat of continued or future racketeering activity. *Id.* at 242; *Borg*, 545 F. Supp. 3d at 315.

14

Additionally, to survive a motion to dismiss a RICO claim, a plaintiff must "plead the circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b)." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989). "[C]onclusory allegations fail to satisfy [Rule] 9(b)'s requirement that averments of fraud be stated with particularity." *Id.* at 684. Defendants do not argue that Plaintiffs fail to allege fraudulent acts with particularity, although they allude to Rule 9(b) in their Motion to Dismiss. (MTD at 8.) Accordingly, the Court makes no ruling on the particularity of Plaintiffs' allegations and, pursuant to Rule 12(b)(6), accepts all allegations relating to the RICO claim as true and particularly pled.

Plaintiffs allege a series of predicate acts by Harrison, individually or through his controlled entities, that plausibly establish a "pattern of racketeering activity." Plaintiffs allege both closed- and open-ended continuity. The Court addresses each in turn.

### a.      Closed-ended Continuity

First, Plaintiffs allege that Defendants' actions constitute closed-ended continuity, as evidenced by a showing of a "series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. All of Defendants' acts, Plaintiffs allege, furthered the Model Tobacco Project. The fact that only one scheme constituted the whole of the predicate acts' goal does not defeat a finding of closed-ended continuity: "One scheme that extends over a substantial period of time, or that shows signs of extending indefinitely into the future, can establish a pattern." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 16 (1st Cir. 2000) (holding seventeen instances of alleged mail or wire fraud during a twenty-one-month period insufficient to constitute a pattern of racketeering activity, but suggesting that allegations that the fraud would continue into the future could constitute a pattern under RICO).

15

Defendants analogize the Model Tobacco Project to *International Data Bank, Ltd. v. Zepkin*, in which the court found that "a single, limited fraudulent scheme, such as the misleading prospectus in this case, is not of itself sufficient to satisfy § 1961(5)." 812 F.2d 149, 154 (4th Cir. 1987). However, the years-long, multi-document scheme that Plaintiffs allege here remains a far cry from a single prospectus distribution. Thus, the single project nature of Model Tobacco alone does not defeat the claim.

Neither does Defendants' analogy to *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989). In *Menasco*, the court held that one perpetrator with a single fraudulent goal of limited purpose — defrauding two investors over the span of one year — did not constitute a pattern under RICO. *Id.* This case is easily distinguishable from *Menasco*. Here, Plaintiffs allege that Harrison, individually and through his entities CAH, CAHC and MBDC, defrauded both the named Plaintiffs and other individuals with regard to multiple interconnected projects, including the Model Tobacco Project. Further, the actions in *Menasco* lasted one year, while Plaintiffs allege five years of predicate acts. Additionally, in describing the deficiencies in the plaintiffs' allegations in *Mensaco*, the Fourth Circuit suggested that the type of allegations Plaintiffs make here would demonstrate a sufficient pattern under § 1961(5): "The complaint fails to supply *any* details regarding either the operation of the dummy corporations or the identity or activity of the other persons purportedly defrauded by the defendant." *Id.* at 684. Here, Plaintiffs supply sufficient details describing Harrison's use of dummy entities, *see, e.g.*, (Am. Compl. at ¶ 96 (allegations relating to Model Tobacco Lofts Development LLC, a company which Harrison allegedly used repeatedly for fraudulent investments despite not existing at the time)), and other victims of purported fraud, *see, e.g.*, (Am. Compl. at ¶¶ 19-26 (Santorini Capital LLC); 31-44 (Steven Sushner)).

16

Furthermore, as continuity constitutes a temporal prong, the Fourth Circuit and other courts evaluate "'the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries.'" *Prof'ls., Inc. v. Berry*, 959 F.2d 231 (Table), at *2 (4th Cir. 1992) (citing *Parcoil Corp. v. NOWSCO Well Serv., Ltd.,* 887 F.2d 502, 504 (4th Cir.1989)). No one factor is determinative. *Id.* In examining the factors, the Supreme Court and the Fourth Circuit often find that schemes that span several years with numerous instances of fraudulent activity alleged satisfy the continuity prong. *See, e.g.*, *H.J. Inc.*, 492 U.S. at 243, 250 (holding that bribes with "some frequency" over at least a *six-year period* may be sufficient to satisfy the continuity requirement, or alternatively by showing that the bribes "were a regular way of conducting . . . ongoing business"); *Morley v. Cohen*, 888 F.2d 1006, 1010 (4th Cir. 1989) ("We think the duration of the activities in question [1976 to 1981] is sufficient to meet this continuity requirement."); *HMK Corp. v. Walsey*, 828 F.2d 1071, 1075 (4th Cir. 1987) ("In a private, commercial context, the fact that a scheme spans *many years* might constitute powerful support for the finding of a pattern of racketeering activity."); *Borg*, 545 F. Supp. 3d at 315 ("The relatedness of these acts . . . and their regular occurrence over a substantial period of time [*four years*] demonstrate the requisite close-ended continuity to establish a pattern of racketeering activity."); *cf. AWAPPA,* 615 F.3d at 318-20 (finding no pattern of racketeering when the conduct spanned a *few weeks*, there existed a definite end point and the complaint failed to allege "indefinite repetition"); *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (finding no continuity when the predicate acts of fraud spanned *seventeen months* and related to a single business which had one cumulation point).

Most circuits have agreed with the Fourth Circuit that related racketeering activity over a period of years constitutes closed-ended continuity sufficient to satisfy the pattern prong. *See, e.g.*, *Handeen v. Lemaire*, 112 F.3d 1339, 1353 (8th Cir. 1997) (finding that *three years* of racketeering activity "was pervasive and is more than sufficient to demonstrate closed-ended continuity"); *Kearney v. Foley & Lardner, LLP*, 607 F. App'x 757, 759 (9th Cir. 2015) ("More than *two years* amounts to a substantial period of time to satisfy the closed-ended continuity requirement."); *Brown v. Cassens Transport Co.*, 546 F.3d 347, 355 (6th Cir. 2008) (holding that *thirteen predicate acts* that span over *three years* constitute a period of closed-ended continuity, especially when alleging that the legitimate business, or part, is conducted regularly by way of fraud through the use of fraudulent communications by mail and wire); *Tabas v. Tabas*, 47 F.3d 1280, 1294 (3d Cir. 1995) (concluding that "a scheme lasting over *three years* extends over a 'substantial' period of time and therefore constitutes the type of 'long-term criminal conduct' that RICO was enacted to address").

Here, Plaintiffs allege "more than fifty racketeering acts over a period of four and a half years." (Pl. Opp. at 17.)  While Defendants argue that "the Fourth Circuit is 'especially cautious' when it comes to finding the existence of a pattern when the predicate acts involved in a RICO claim are mail and wire fraud" because "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice," *Williams v. Equity Holding Corp.*, 245 F.R.D. 240, 243 (4th Cir. 2007), they do not dispute the high number of alleged acts.  Additionally, while most of the acts alleged do constitute mail and wire fraud, Plaintiffs also allege thirty-three acts of bank fraud, numerous acts of money laundering and additional acts of fraud.  (Am. Compl. ¶¶ 217-21.)

18

Furthermore, the Supreme Court has adopted a nonrestrictive reading of the RICO statute, as "[t]his is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L.*, 473 U.S. at 497–98 (citing *United States v. Turkette,* 452 U.S. 576, 586–587 (1981), and Pub.L. 91–452, § 904(a), 84 Stat. 947)) (cleaned up). Thus, while allegations of mail and wire fraud signal to courts to proceed with caution with regard to a RICO claim, courts consistently find that "the ambit of RICO may encompass a 'legitimate' businessman who regularly conducts his business through illegitimate means, that is, who repeatedly defrauds those with whom he deals and, in the process, commits predicate acts, *for instance by using the postal service as a means of accomplishing his scheme*." *Tabas*, 47 F.3d at 1293 (emphasis added). Regardless of the weight that the Court affords to the wire fraud allegations, the sheer number of predicate acts — both with and without the wire fraud allegations — sufficiently demonstrates closed-ended continuity. More than fifty acts over a period of five years constitutes the type of long-term criminal activity that Congress sought to curtail in enacting the RICO statute.

Plaintiffs further allege that Harrison, individually and through his controlled entities, committed additional fraudulent acts through other related and unrelated schemes. (Am. Compl. ¶¶ 19-29 (Santorini deal); 31-44 (Sushner investment); 128-50 (Brinser Street Property).) In *H.J. Inc.*, the Court noted that "proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity." 492 U.S. at 240. The Court finds these allegations further proof of the existence of a closed-ended continuity which, with the relatedness of the predicate acts, establishes a RICO pattern.

### b.      Open-ended Continuity

Plaintiffs also assert that their allegations of Defendants' predicate acts constitute open-ended continuity. (Pl. Opp. at 16.) As the Court has already determined that Plaintiffs sufficiently pled a pattern of RICO violations via closed-ended continuity, the Court need not determine whether Plaintiffs allegations also satisfy open-ended continuity at this stage. *See H.J., Inc.*, 492 U.S. at 240 (requiring *either* closed-ended *or* open-ended continuity).

### 2.      Securities Fraud Claim

Defendants' Motion to Dismiss challenges Plaintiffs' securities fraud claim on three grounds: (1) the applicable statute of limitations bars the claim for relief; (2) Plaintiffs failed to state a securities fraud claim as they insufficiently pled the existence of a false statement or omission of a material fact and scienter; and (3) existing contracts between the parties supersede statements made during negotiations which give rise to the alleged fraud. The Court will discuss each in turn, finding none of the arguments persuasive. Thus, the Court DENIES Defendants' Motion to Dismiss as to Count Two of Plaintiffs' Amended Complaint.

### a.      Statute of Limitations

28 U.S.C. § 1658(b) governs the statute of limitations for Plaintiffs' securities fraud claim pursuant to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Section 1658(b) states:

> a private right of action that involves a claim of fraud, deceit, manipulation, or contravince in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

Defendants argue that the two-year statute of limitations bars the alleged fraud in the Second Count as Plaintiffs discovered the facts constituting the alleged fraud in 2019 and did not file the original complaint until 2022. However, Defendants assert this defense prematurely.

20

Courts ordinarily do not resolve the applicability of affirmative defenses, such as statute

of limitations, through a Rule 12(b)(6) motion.  *See Edwards v. City of Goldsboro*, 178 F.3d 231,

243 (4th Cir. 1999) ("The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a

complaint . . . 'not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses.'") (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir.

1992)).  "In the limited circumstances where the allegations of the complaint give rise to an

affirmative defense, the defense may be raised under Rule 12(b)(6), but only if it clearly appears

on the face of the complaint." *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d

244, 250 (4th Cir. 1993) (finding affirmative defenses "inappropriate" to address in a motion to

dismiss posture as "these defenses are more properly reserved for consideration on a motion for

summary judgment"); *see also Goodman v. Praxir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)

(dismissal under Rule 12(b)(6) based on the statute of limitations occurs only in the "relatively

rare circumstances" when "all facts necessary to the defense appear on the face of the

complaint").  As the inquiry into when Plaintiffs discovered the alleged securities fraud is

inherently a "fact-intensive issue" over which there exists disagreement between the parties, the

statute of limitations defense "is properly left for resolution at a subsequent stage of the

proceeding." *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic*, 2020 WL 5526585,

at *3 (D. Md. Sept. 15, 2020).

Thus, the Court now turns to whether Plaintiffs sufficiently pled a false statement or

omission of material fact and scienter to support a claim for securities fraud under 15 U.S.C.

§ 78j(b) and 17 C.F.R. § 240.10b-5.

### b.    Failure to State a Claim

To bring a claim for a violation of Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege: "(1) the defendants made a false statement or omission of material fact; (2) with scienter; (3) upon which the plaintiffs justifiably relied; (4) that proximately caused the plaintiffs' damages." *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004). The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 761 (E.D. Va. 2004) (holding that "[t]he PSLRA codifies the requirements of Rule 9(b)" and requires plaintiffs to state with particularity facts giving rise to fraud and the required state of mind). Defendants argue that Plaintiffs failed to plead with particularity that Defendants made false statements or omissions of material fact with the requisite scienter.[4]

### i.    False statement or omission of material fact

To successfully plead the first element — namely, that Defendants made a false statement or omitted a material fact — Plaintiffs must point to a factual statement or omission — "that is, one that is demonstrable as being true or false." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091-96 (1991)). Second, the statement must be false or the omission misleading. *Id.* (citing 17 C.F.R. § 240.10b-5). Finally, the statement or omission of fact must be material — "an objective concept

---

[4]    Defendants do not challenge the other prongs of a securities fraud claim. As such, the Court does not analyze the sufficiency of the pleadings of the other prongs or threshold inquiries.

'involving the significance of an omitted or misrepresented fact to a reasonable investor.'" *Id.*

(citing *Gasner v. Bd. of Sup'rs of the Cty. of Dinwiddie*, 103 F.3d 351, 356 (4th Cir. 1996)).

With regard to omitted facts, "'to fulfill the materiality requirement' in the . . . Rule 10b-5 context 'there must be a substantial likelihood that the disclosure of the omitted fact would have been reviewed by a reasonable investor as having significantly altered the total mix of information made available.'" *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). For false statements, especially those future-looking regarding "contingent or speculative information or events, materiality will depend upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* (cleaned up and citations omitted). Therefore, materiality "is a fact-specific inquiry." *Basic, Inc.*, 485 U.S. at 240.

Mere business "puffery," for example, lacks the materiality essential to a securities fraud allegation. *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992). Statements relating to strong finances and future developments, such as "healthy growth," "achieving our objectives" and "competitive advantages" constitute paradigmatic examples of non-material business puffery, which cannot be actionable under securities laws. *In re Cable & Wireless, PLC*, 321 F. Supp. 2d at 767. However, in some contexts "when [puffery] is both factual and material, it may be actionable." *Longman*, 197 F.3d at 683. The Fourth Circuit has also distinguished between "allegedly false predictions [which] are not material," and "expressions of belief or opinion concerning *current* facts" which may be material. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993).

23

In the case at bar, Plaintiffs allege false statements and omissions that constitute more than puffery. Plaintiffs allege particularized and current representations made by Harrison to induce Plaintiffs to invest in the Model Tobacco Project. Harrison assured Plaintiffs that the Project was "shovel-ready," that he had already "secured debt financing for the purchase and construction of the Project" and that "SSR and MKR would not be required to invest more than $1.6 million in the Project." (Am. Compl. ¶ 229.) Additionally, Harrison laid out a timeline for purchase, construction and return-realization that Plaintiffs allege that he knew to be impossible to meet. (Am. Compl. ¶ 229.) These statements constitute more than a "rosy affirmation" or optimistic future projection by Defendants. *In re Cable & Wireless, PLC*, 321 F. Supp. 2d at 766. The concrete, present-tense nature of the claims made to induce investment fall under the type of statement that the securities laws protect against. *See Hillson*, 42 F.3d at 212 (contrasting non-material "vague predictions of growth" with statements and guarantees as to present facts held as material).

Plaintiffs must also prove that the statements meet the three prongs of materiality. They do. First, Plaintiffs demonstrate the true-false or factual nature of the claims. Plaintiffs based their allegations in provable fact: a project is or is not shovel-ready, financing has or has not been secured. Second, Plaintiffs allege the falsity of Defendants' claims. For example, the project did not become "shovel-ready," or ready for construction to begin immediately, until October 2020 when MT Development secured construction financing, despite Harrison claiming shovel-readiness in September 2017. (Am. Compl. ¶¶ 49, 112.) Additionally, Harrison had not financed the project in 2017 as he claimed; financing arrived in 2020. (Am. Compl. ¶¶ 49, 112.) Lastly, in weighing the significance of the false statements or omissions to determine materiality, the Court finds the above statements highly material. A reasonable investor would find whether

24

a project could begin shortly and whether Defendants had secured investments greatly significant in determining whether or not to invest.  Similarly, with regard to the projected timeline that Harrison provided to Plaintiffs, in "balancing both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity," the Court finds the schedule material.

Furthermore, Plaintiffs meet the particularity requirement of the PLSRA and Rule 9(b) for securities fraud claims.  Pursuant to 15 U.S.C. § 78u-4, the Amended Complaint's allegations specify each statement alleged to have been misleading.  (Am. Compl. ¶ 229 (explicitly laying out seven instances of false statements made).)  Moreover, the Complaint alleges "the reason or reasons why the statement is misleading." § 78u-4(b)(1).  Plaintiffs allege that the statements misled them as the Project could not possibly meet the projected timeline, something that they remained unaware of at the time.  (Am. Compl. ¶ 57.)  Finally, Harrison's claims regarding the current status of the project demonstrate his knowledge of their falsity, as the stated events had not yet occurred.  Thus, Plaintiffs pleaded materiality of false statements or omissions with particularity.  The Court now turns to whether Plaintiffs sufficiently pled scienter.

### ii.  Scienter

In a securities fraud action, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976).  Additionally, a plaintiff can establish scienter by a showing of recklessness. *Ottman v. Hang Orthopedic Grp., Inc.*, 353 F.3d 338, 334 (4th Cir. 2003).  The Fourth Circuit defines recklessness as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

*Phillips v. LCI Intern, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999). The severity of the recklessness standard makes it akin to "a slightly lesser species of intentional misconduct." *Ottman*, 353 F.3d at 344 (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). Thus, mere negligence does not satisfy the required level of scienter for a securities fraud claim. *See Ernst & Ernst*, 425 U.S. at 199 (holding that the language of the statute makes "unmistakable a congressional intent to proscribe a type of conduct quite different than negligence").

Furthermore, a plaintiff must state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To determine whether a plaintiff sufficiently pled a "strong inference" of scienter, "courts should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter. And, while particular facts demonstrating a motive and opportunity to commit fraud . . . may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case." *Ottmann*, 353 F.3d at 345–46; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) ("The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.") (emphasis in original). However, this exploration "is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . . [A] court must consider plausible, nonculpable explanations for the defendant's conduct[.]" *Tellabs*, 551 U.S. at 324 (stressing holistic review).

Here, the question is "whether plaintiffs' inference of scienter is 'cogent and at least as compelling' as defendants' inference of a legitimate business judgment." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 626 (4th Cir. 2008). The Court finds that it is. Plaintiffs allege that

*all* of Defendants actions taken together give rise to an inference of scienter, while Defendants

dispute only whether promises made during negotiations plead scienter. Plaintiffs correctly

focus on the holistic view. With this broad scope in mind, the Court finds that fraudulent intent,

or at least severe recklessness, appears more likely than mere negligence or innocent intent.

First, Plaintiffs point to explicit statements during purchase negotiations that Plaintiffs

allege Defendants knew to be false: (1) that project "was shovel ready," despite not having

secured financing or the land at the time; (2) that Harrison had secured debt financing already,

when no financing negotiations had yet begun; (3) that Plaintiffs would only have to invest $1.6

million each in capital contributions, a number that grew almost immediately after purchase; and

(4) that construction would begin in Spring 2018, complete in 2019, and Plaintiffs would receive

returns by late 2019, despite knowledge of the impossibility at the time. (Am. Compl. ¶ 229.)

Plaintiffs allege that Harrison, individually and through his entities, knew the falsehood of these

statements and thus made them with fraudulent intent. (Am. Compl. ¶ 58.) The subsequent

emails and alleged false statements to cover up the delays in the timeline, and the repeated

requests for additional capital contributions as a result of these delays, give rise to an inference

that Harrison had an "intent to deceive, manipulate, or defraud" in making the original

statements to induce investment. *Ernst & Ernst*, 425 U.S. at 194 n.12.

Further allegations in the complaint bolster this claim. Once Plaintiffs invested, Harrison

allegedly misused or mishandled MT Development funds repeatedly, including by paying

obligations of other entities, comingling bank account funds and making dozens of unauthorized

withdrawals. (Am. Compl. ¶¶ 151-64.) While these actions could constitute negligence when

viewed in isolation, they give rise to a strong inference of scienter when combined with the

allegations that Harrison repeatedly prepared fraudulent accounting records, with no oversight,

which contained no receipts and no documentation.  (Am. Compl. ¶¶ 165-77, 184.)  The fraudulent records that Harrison refused to explain despite repeated entreaties by Plaintiffs, the seemingly bold-faced falsehoods used as inducements to get Plaintiffs to invest and the repeated refusals to allow Plaintiffs to examine business records of entities of which they acted as members combine to suggest that a culpable inference appears more likely than the nonculpable inference. *Cf. In re Computer Scis. Corp. Sec. Lit.*, 890 F. Supp. 2d 650, 664 (E.D. Va. 2012) (weighing the likelihood of a culpable versus nonculpable inference to determine scienter).  Thus, Plaintiffs have sufficiently pled a strong inference of scienter to defeat the motion to dismiss at this stage, although examination of discovery may suggest otherwise.

### iii.    Merger Clause

Defendants argue that a contracting party may not reasonably rely on oral statements that contradict the plain terms of a written agreement.  While the idea garners much case support, *see, e.g.*, *Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 126 (4th Cir. 1990) (finding "no reasonable reliance on the oral statements in the face of plainly contradictory contractual language" in the context of a state law fraud claim), the Motion to Dismiss' sole case support, *Girgis v. Salient Solutions, Inc.*, 2012 WL 2792157 (E.D. Va. July 9, 2012), does not stand for the proposition for which it is cited.[5]

Furthermore, district courts in our circuit have not applied this proposition in the context of securities fraud to waive the claim.  "A general merger clause . . . cannot bar a federal securities fraud claim because the Securities Act itself precludes agreements waiving compliance with the statute's anti-fraud provisions." *FS Photo, Inc. v. PictureVision, Inc.*, 61 F. Supp. 2d 473, 480 (E.D. Va. 1999) (citing 15 U.S.C. § 78cc(a)) ("Any condition, stipulation or provision

---

[5]     The Motion to Dismiss' quoted language instead comes from *Design & Prod. v. Am. Exhibitions, Inc.*, 820 F. Supp. 2d 727, 741 (E.D. Va. 2011).

binding any person to waive compliance with any provision of this chapter or any rule or regulation thereunder, or any rule of an exchanged required thereby shall be void."). Thus, courts have consistently rejected the argument that an "entire agreement" contract provision can kick a federal securities law claim out of court. *See, e.g.*, *Direct Benefits, LLC v. TAC Fin. Inc.*, 2014 WL 671616, at *6 (D. Md. Feb. 20, 2014) (concluding that a merger clause does not prohibit the plaintiffs from claiming reliance on pre-agreement statements in a securities fraud case); *Jadoff v. Gleason*, 140 F.R.D. 330, 334-36 (M.D.N.C. 1991) (rejecting the argument that contractual acknowledgments signed by plaintiffs constituted waiver of their right to bring a claim as that would "constitute a license for fraud"). Similarly, "the mere presence of a general release purporting to relieve each defendant of all liability connected with this transaction is not dispositive." *Am. Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F. Supp. 721, 751 (E.D. Va. 1980) (holding that a contractual general release does not bar liability upon defendants under § 10(b) when "plaintiff was the victim of deliberate misrepresentation and intentional concealment of material facts"). Therefore, the language in the Operating Agreement and Amended Operating Agreement stating that the contract supersedes all prior agreements between parties does not preclude Plaintiffs from bringing this claim.

Because the Court finds Defendants arguments lacking regarding (1) the statute of limitations, (2) Plaintiffs' failure to state a claim and (3) the merger clause barring suit, the Court DENIES Defendants' Motion to Dismiss as to Count Two of Plaintiffs' Amended Complaint.

### 3.      State Law Fraud Claims

Defendants argue that the Court should dismiss Plaintiffs' state law fraud claims, Counts Five and Eight, for failure to state a claim. As to the fraud claim alleged in Count Five, Defendants argue that Plaintiffs failed to plead facts sufficient to show that Harrison intended to

fulfill his promise to credit Plaintiffs for prior investments in another deal. Defendants also argue that because Plaintiffs' fraud claims arise out of an alleged breach of contract, the Court should dismiss the claims under Virginia law, which bars such claims under the economic loss rule. Further, Defendants argue that Plaintiffs insufficiently pled allegations regarding intent to conceal the purchase of the Brinser Street Property, that underlies Count Eight, which alleges fraud by concealment.

### a.     Economic Loss Rule

Virginia law bars recovery for economic losses in tort actions. The economic loss rule exemplifies the "bedrock principle that contract damages be limited to those 'within the contemplation and control of the parties in framing their agreement.'" *City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 446 (4th Cir. 1990) (quoting *Kamlar Corp. v. Haley*, 299 S.E.2d 514, 517 (Va. 1983)). "The rule bars parties from recovering in tort 'simply by recasting a contract claim as a tort claim.'" *Hazaimeh v. U.S. Bank Nat. Ass'n*, 94 F. Supp. 3d 741, 747 (E.D. Va. 2015) (quoting *Waytec Elecs. Corp. v. Rohm & Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 491 (W.D. Va. 2006)). Thus, "if the defendant breaches a duty owned to the plaintiff only through a contractual agreement, the plaintiff may not recover purely economic losses in a related tort action against the defendant." *Tidewater Beverage Servs., Inc. v. Coca Cola Co.*, 907 F. Supp. 943, 947–48 (E.D. Va. 1995).

In *Madison Management Group*, the Fourth Circuit outlined when the rule should *not* be applied: "[I]f, when the surface is scratched, it appears that the defendant has breached a duty imposed by law, not by contract, the economic loss rule should not apply." 918 F.2d at 446. This "independent tort is one that is factually bound to the contractual breach but whose legal elements are distinct from it." *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir.

30

1988) ("Fraud is a wilful [sic] tort."). Therefore, if a defendant breaches both a contractual duty and a legal duty separately imposed by law, "i.e., the duty not to commit fraud," then the economic loss rule cannot shield the defendant. *Id.* at 447 (noting that Virginia law recognizes a separate tort of fraud, even between contracting parties); *see also Tidewater Beverage*, 907 F. Supp. at 948 (holding that allegations of breach of contractual and legal duties negate protection for the defendant under the economic loss rule).

Relevant here, Virginia law "distinguishes between a statement that is false when made and a promise that becomes false only when the promisor later fails to keep his word. The former is fraud, the latter is breach of contract." *Lissman*, 848 F.2d at 53. Thus, the question that a court must ask "is whether the defendant's statement . . . was false when made." *Id.* (distinguishing between a false statement and "a promise to perform an act in the future," which "is not, in a legal sense, a representation as that term is used in the fraud context").

Here, the economic loss rule does not apply as there is no need to "prevent[] plaintiff from pasting an ill-suited tort label on a set of facts that supports nothing more than a breach of contract claim." *Madison Mgmt. Grp., Inc.*, 918 F.2d at 446. Plaintiffs have sufficiently alleged facts that support an independent legal claim separate from their breach of contract-based claims. Not abiding by a promise generates a contract, not a tort, claim, *Colonial Ford Truck Sales, Inc. v. Schneider*, 325 S.E.2d 90, 94 (Va. 1985), "unless the statement was false when made, *i.e.,* unless [the defendant] did not intend to keep its promise when it made it." *Lissmann*, 848 F.2d at 54. Plaintiffs sufficiently alleged that Harrison made a false statement, lacking any intent to fulfill his promise when made. The Amended Complaint specifically pleads that Defendants "never intended to" credit Plaintiffs with $431,300 to offset a reduction in an unrelated debt. The Amended Complaint thus alleges that Harrison knew that his statements

31

were false at the time and intentionally made them to defraud Plaintiffs.  (Am. Compl. ¶¶ 252-53.)  As Plaintiffs pled in their Fifth Claim for Relief that Harrison made false representations that he never intended to fulfill and knew to be false at the time, Plaintiffs have sufficiently pled fraud independent of their breach of contract claims.  The Court therefore declines to apply the economic loss rule here.  *See Madison Management*, 918 F.2d at 447 (holding that allegations that defendant knew at the time of promise that it would not fulfill its promise constituted a separate tort claim).

### b.   Fraud Claim

Defendants further attack Plaintiffs' fraud claim for failure to plead intent to mislead.  The Court finds that Plaintiffs sufficiently pled intent and hereby DENIES Defendants' motion to dismiss Plaintiffs' Fifth Claim for Relief.

Under Virginia law, "[a] cause of action for actual fraud requires that a plaintiff prove: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 581 (Va. 2003).  "[A] fraud claim cannot ordinarily be predicated on unfulfilled promises or statements as to future events," *Design & Prod., Inc.*, 820 F. Supp. 2d at 741 (internal quotation omitted), nor "the mere expression of an opinion." *Mortarino v. Consultant Eng'g Servs., Inc.*, 467 S.E.2d 778, 781 (Va. 1996) (citation omitted).  However, "where a promisor makes a promise with the present intention of never fulfilling it," a claim for actual fraud can be brought. *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 454 (E.D. Va. 2009) (citing *Colonial Ford*, 325 S.E.2d at 94); *see also Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 537 (4th Cir. 1988) (holding that where defendants never

intended to abide by the terms of the contract, as evidenced by circumstantial evidence from the moment of signature, plaintiffs alleged a claim for fraud by inducement).

Virginia law requires that pleadings "show specifically in what the fraud consists, so that the defendant may have the opportunity of shaping his defense accordingly." *Id.* at 782 (quotation omitted). However, the pleading standards under the Federal Rules of Civil Procedure apply to the instant case in federal court. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Plaintiffs sufficiently alleged that Harrison intended to break his promise to credit Plaintiffs with $431,300 when he made it. The Amended Complaint specifically pleads that Defendants "never intended to" credit Plaintiffs with $431,300 and Harrison knew that his statements were false at the time and intentionally made them to defraud Plaintiffs. (Am. Compl. ¶¶ 252-53.) Plaintiffs further allege inducement as a result of the representation and damages in the amount of $431,300. (Am. Compl. ¶¶ 254-55.) At this stage, the Court only tests the sufficiency of Plaintiffs' allegations in the Complaint. Similarly, Defendants urging of the Court to require "clear, cogent, and convincing proof" of the allegations finds no place at the Rule 12(b)(6) stage. *Cf. Petra Intern. Banking Corp. v. First Am. Bank of Va.*, 758 F.Supp. 1120, 1141 (E.D. Va. 1991) (applying this standard to review a motion for summary judgment); *Patrick v. Summers*, 369 S.E.2d 162, 165 (Va. 1988) (reviewing a jury verdict).

As Plaintiffs sufficiently pled fraudulent intent under Rule 9(b) at a Rule 12(b)(6) phase, the Court hereby DENIES Defendants' Motion to Dismiss as to Count Five.

### c.      **Fraud by Concealment Claim**

Defendants challenge Count Eight of the Amended Complaint, alleging fraud by concealment, arguing that Plaintiffs failed to sufficiently plead Defendants' intent to conceal the

purchase of the Brinser Street Property, the transaction upon which Plaintiffs base the claim. At this stage, the Court only tests the sufficiency of the allegations pled in the Complaint. *Republican Party of N.C.*, 980 F.2d at 952. Yet, Defendants urge the Court to do the opposite: to weigh evidence and look outside of the four corners of the Amended Complaint. The Court declines to do both. For the reasons stated below, the Court DENIES Defendants' Motion to Dismiss Count Eight.

Defendants claim that Plaintiffs fail to allege fraud by concealment constituting actual and/or constructive fraud. "Concealment of a material fact, 'knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if the existence of the fact were expressly denied.'" *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) (quoting *Metrocall of Del., Inc. v. Continental Cellular Corp.*, 437 S.E.2d 189, 193 (Va. 1993)); *see also Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) ("[C]oncealment, whether by word or conduct, may be the equivalent of a false representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth.") (citation omitted). "Concealment may constitute actual fraud where there is 'evidence of a knowing and deliberate decision not to disclose a material fact.'" *Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 871 (E.D. Va. 2009) (quoting *Norris v. Mitchell*, 495 S.E.2d 809, 812 (Va. 1998)). Thus, actual fraud by concealment requires a willful and intentional failure to disclose "a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist." *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 597 (Va. 1984); *see also Bank of Montreal*, 193 F.3d at 827 (holding that fraud by concealment requires actual intent to conceal a fact from the other party, and reckless non-disclosure is not actionable). Constructive fraud by concealment, in contrast, occurs when a

34

party "lacks the intent to conceal a material fact, but the party had a duty to disclose information and its failure to disclose causes damage to one reasonably relying upon that omission." *Noell Crane*, 677 F. Supp. 2d at 871 (citing *Cohn*, 585 S.E.2d at 582). "Silence does not constitute concealment in the absence of a duty to disclose." *Bank of Montreal*, 193 F.3d at 827.

Defendants argue that Plaintiffs failed to plead actual intent to conceal the Brinser Street Property from Plaintiffs and that Defendants did not have a duty to disclose the fact of purchase. (MTD at 22-23.) Defendants argue that the Brinser Street purchase appeared on the ledgers of MT Development and Plaintiffs contributed additional capital contributions as a result, which negates the intent to disclose the purchase. (MTD at 22.) Plaintiffs' Amended Complaint alleges that Harrison told Plaintiffs that he would inform them when the property went up for sale, but when the property came up for sale, he did not inform Plaintiffs. (Am. Compl. ¶¶ 129, 265.) Plaintiffs further allege that Harrison did not ask Plaintiffs whether MT Development should invest in the property, but instead unilaterally purchased the property using MT Development's money. (Am. Compl. ¶¶ 131-32.) Plaintiffs further allege, as proof of concealment, that Defendants began including the property's purchase on expense ledgers to induce further capital contributions from Plaintiffs, which it did, and to conceal the fact that Harrison purchased Brinser Street for his own benefit. (Am. Compl. ¶¶ 138-40, 267-68.) Additionally, Plaintiffs allege that Defendants knew at the time of purchase that the property would not benefit MT Development, despite use of funds from the entity. (Am. Compl. ¶¶ 147-49.)

Plaintiffs' "assertions of fraudulent intent and concealment amount to" more than "mere speculation or bare inference," which would not give rise to a claim. *Noell Crane*, 677 F. Supp. 2d at 872. Instead, the allegations contained in the Amended Complaint sufficiently plead intent

35

under a claim for fraud by concealment. Plaintiffs allege that Harrison knew that the Brinser Street purchase would not be used to benefit Plaintiffs when the purchase was made, despite the use of MT Development funds. The allegations regarding the failure to inform Plaintiffs of the potential purchase, the purchase without their knowledge and the subsequent inclusion on expense ledgers without any further documentation all combine to give rise to a claim of intent stated with particularity.

Defendants also argue that Plaintiffs failed to plead damages as a result of the concealment, but Plaintiffs allege that (1) Harrison used the purchase as inducement for additional capital contributions from Plaintiffs otherwise not required, which Plaintiffs made (Am. Compl. ¶¶ 141, 268-71); (2) Defendants withdrew $125,000 from the MT Development bank account on March 6, 2018, to pay for the purchase, despite no authorization from Plaintiffs (Am. Compl. ¶¶ 161, 222); (3) Harrison sent $155,000 to the escrow agent without accounting for the $30,000 discrepancy (Am. Compl. ¶¶ 161, 222); and (4) Defendants made four additional wire transfers regarding the purchase. (Am. Compl. ¶ 222.) The allegations containing specific dollar amounts, dates, recipients and effects of the fraud plead with particularity to sufficiently plead Plaintiffs' damages to survive a motion to dismiss under Rule 12(b)(6).

While Defendants proffer innocent explanations and further documentation explaining the allegations, the Court does not weigh the evidence at this stage. *Republican Party of N.C.*, 980 F.2d at 952. On the face of the Complaint, Plaintiffs have pled intent to conceal sufficiently to survive a motion to dismiss. The Court hereby DENIES Defendants' Motion to Dismiss as to Count Eight.

### 4.    Motion to Strike

Defendants move to challenge Plaintiffs' allegations regarding the Amended Operating Agreement, but fail to identify a specific count to which they object.  (MTD at 25 ("The Amended Complaint does not identify the counts to which these allegations are directed.").)  As such, Defendants urge the Court, that "to the extent that these allegations are directed to any specific cause of action," to find that the assertions fail to state a claim under Rule 12(b)(6). (MTD at 25.)  The Court declines to do so and will construe Defendants' request to remove all references to the allegedly fraudulent Amended Operating Agreement as a motion to strike under Fed. R. Civ. P. 12(f).

Rule 12(f) allows a district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Whether to grant a motion to strike under Rule 12(f) falls within the sound discretion of the district court.  *GTSI Corp. v. Wildflower Int'l, Inc.,* 2009 WL 2160451, at *4 (E.D. Va. July 17, 2009).  Striking material under Rule 12(f) is generally disfavored, "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic."  *Waste Mgmt. Holdings, Inc. v. Gilmore*§ 252 F.3d 316, 347 (4th Cir. 2001) (citation omitted).  Here, Defendants do not argue that the allegations relating to the Amended Operating Agreement are redundant, immaterial, impertinent or scandalous; they merely describe the allegations as "absurd and unsubstantiated." (MTD at 26.)  The Court finds Defendants' argument insufficient and DECLINES to strike the references to the fraudulent agreement.

### 5.    Remaining State Law Claims

Defendants move to dismiss Plaintiffs' remaining state law claims — MT Development Operating Agreement Breach of Contract (Count Three), Developer Operating Agreement

Breach of Contract (Count Four), Disassociation from Development Group (Count Six) and

Disassociation from Developer (Count Seven) — for lack of subject matter jurisdiction.  Based

on the assumed dismissal of Plaintiffs' federal law claims, Defendants move the Court to decline

to exercise supplemental jurisdiction over the state law pendent claims under 28 U.S.C.

§ 1367(a).  As the Court has already denied Defendants' motion as to Plaintiffs' first two claims,

the Court likewise rejects Defendants' challenges to the state law claims.

### B.    Amended Counterclaims' Second Cause of Action

In their Motion to Dismiss Defendants' Amended Counterclaims, Plaintiffs argue that

Defendants failed to allege any contractual obligation that Plaintiffs allegedly breached under the

Amended Operating Agreement.  (Mem. in Supp. of Pls.' Mot. to Dismiss Am. Counterclaim

("MTD CC") (ECF No. 42) at 5-7.)  Additionally, Plaintiffs argue that the Agreement's

mandatory dispute resolution bars the breach of contract claim.  (MTD at 7-10.)  Lastly,

Plaintiffs argue that Defendants failed to plead any injury they suffered and thus do not have

standing to bring the claim.  (MTD at 10-11.)  The Court will address the standing issue first,

*Griffin*, 293 F. Supp. 3d at 578, and, in finding that no Defendants suffered an injury, the Court

need not turn to the merits.

Plaintiffs argue that Defendants lack standing to bring a breach of contract claim, because

Defendants have not suffered any injury under Article III.  (MTD CC at 10.)  Plaintiffs more

specifically argue that Defendants have not themselves suffered any harm as a result of the

alleged breach of contract but rather the non-party entity MT Development allegedly suffered

damage.  (MTD CC at 10-11.)

To satisfy the case-or-controversy requirement of Article III, the party invoking federal

jurisdiction must establish his or her standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560–61 (1992); *see also Balzer & Assocs., Inc. v. Union Bank & Trust Co.*, 2009 WL 1675707, at *2 (E.D. Va. June 15, 2009) ("On a motion to dismiss pursuant to Rule 12(b)(1), the party asserting jurisdiction has the burden of proving subject matter jurisdiction.") (citation omitted). To meet the "irreducible constitutional minimum" requirements for standing, a party bringing a claim must establish three elements:  (1) that the plaintiff has sustained an injury in fact; (2) that the injury traces to the defendants' actions; and (3) that a favorable judicial decision could likely redress the injury.  *Uzuegbunam v. Precsewski*, 141 S. Ct. 792, 797 (2021); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011) (*citing Lujan*, 504 U.S. at 560–61).

Relevant to the counterclaim here, the counterclaim-plaintiff must demonstrate that he suffered an injury himself.  A claim cannot be brought on behalf of another non-party to the suit, excepting third-party standing principles that are not at issue here.  *See Raines v. Byrd*, 521 U.S. 811, 818-19 (1997) (standing doctrine is based upon "whether the plaintiff is the proper party to bring suit"); *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460 (4th Cir. 2005).  "We have consistently stressed that a plaintiff's complaint must establish that he has a '*personal stake*' in the alleged dispute, and that the alleged injury suffered is *particularized as to him*."  *Raines*, 521 U.S. at 819 (emphasis added).

The personal stake standing requirement does not change when the party asserting an injury is a limited liability company.  An LLC is a legal entity in its own right and can proceed as a party in litigation themselves:  "It is an independent entity which can sue and be sued."  *Hagan v. Adams Prop. Assocs., Inc.*, 482 S.E.2d 805, 807 (Va. 1997); *Mission Residential, LLC v. Triple Net Properties, LLC*, 654 S.E.2d 888, 891 (Va. 2008) ("[A] limited liability company is a legal entity entirely separate and distinct from the shareholders or members who compose it.");

39

Va. Code §§ 13.1–1009, –1019. "[A]ny claim regarding [an LLC's] assets must be pursued by, and in the name of, the LLC." *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 356 (Va. 2019) (citing 10 William R. Waddell & Lee A. Handford, Virginia Practice Series: Business Entities § 1:15, at 29 (2018 ed.)). "And this rule applies with equal force even though the LLC has only a single member." *Id.* (citing Waddel & Handford, at 29 n.3). Similarly, under Virginia law,

> [a] member of a limited liability company, solely by reason of being a member, is not a proper party to a proceeding by or against a limited liability company, except where (i) the object is to enforce a member's right against or liability to the limited liability company or (ii) as provided in Article 8 [ ] of this chapter.[6]

Va. Code § 13.1-1020.

With regard to standing to bring breach of contract claims, the Fourth Circuit has held that members of an LLC lack standing to bring claims regarding contracts to which the LLC was a party. *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 349 (4th Cir. 2013) (holding LLC members lacked standing to bring claims for tortious interference with contract when they were not parties to the contract and the injuries suffered derived entirely from the injury their company allegedly sustained). As the court stated in *Painter's Mill Grille*, "At bottom, [members] gave up standing to claim damages to the LLC, even if they also suffered personal damages as a consequence." 716 F.3d at 358.

Here, Defendants bring a counterclaim against Plaintiffs alleging that "Model Tobacco Development Group, LLC will incur expenses in excess of $75,000." (Def. Am. CC ¶ 31.) MT Development is not a defendant in this suit, nor even a party. Defendants do not claim in their Second Cause of Action that they incurred any injury, only claiming that MT Development has

---

[6] The two exceptions listed in Article 8 are not at issue here. As such, the Court will not address them.

suffered an economic injury as a result of the alleged breach of contract by Plaintiffs. Thus, MT Development is the proper party to bring this claim, not Defendants. § 13.1-1020. This does not change with the fact that Defendants are members of or affiliated with MT Development. *Painter's Mill Grille*, 716 F.3d at 349. As Virginia law expressly forbids members to bring suits on behalf of an LLC, unless derivatively, which is not at issue here, Defendants cannot bring suit on behalf of MT Development. § 13.1-1020. Thus, Defendants lack standing to bring the breach of contract counterclaim.

Therefore, the Court lacks subject matter jurisdiction over this claim against Plaintiffs and will not turn to the merits of the claim. The Court hereby GRANTS Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaim and DISMISSES Defendants' Second Counterclaim WITHOUT PREJUDICE.

## IV.    CONCLUSION

For the reasons set forth above, the Court will DENY Defendants' Motion to Dismiss (ECF No. 44). This case shall proceed on Counts One through Eight of the Amended Complaint against Defendants. The Court will GRANT Plaintiff's Motion to Dismiss (ECF No. 41). In sum, the Court DISMISSES WITHOUT PREJUDICE[7] Defendants' Second Counterclaim,

---

[7]    A "dismissal for lack of standing — or any other defect in subject matter jurisdiction — must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *Ali v. Hogan*, 26 F.4th 587, 600 (4th Cir. 2022) (citing *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)).

while Defendant's Counterclaims Causes One and Three shall proceed against Plaintiffs.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  November 9, 2022